65 Cal.Rptr.3d 100 (2007)
154 Cal.App.4th 586
CENTRAL COAST BAPTIST ASSOCIATION, Plaintiff and Respondent,
v.
FIRST BAPTIST CHURCH OF LOS LOMAS, et al., Defendants and Appellants.
No. H029958.
Court of Appeal of California, Sixth District.
August 23, 2007.
*105 Omar F. James, Johnson & James, LLP, Aptos, for Appellants, First Baptist Church of Los Lomas, et al.
Edward W. Smithers, Smithers Law Firm, Mary Ann O'Hara, San Jose, Maureen *106 L. Tabari, for Respondent, Central Coast Baptist Association.
BAMATTRE-MANOUKIAN, Acting P.J.
Central Coast Baptist Association (Central Coast) is a voluntary association of approximately 100 Southern Baptist churches in California's central coast counties. First Baptist Church of Los Lomas (First Baptist) is a Southern Baptist church in Monterey County that is associated with Central Coast. Central Coast brought this action against First Baptist and against New Life Community Church of Prunedale (New Life) and New Life's pastor, Hank Holley. Central Coast alleged that an attempted takeover of First Baptist by New Life, a nondenominational church, triggered a reversionary clause in article VII, section 3, of First Baptist's constitution, which provided that the assets of First Baptist would pass to Central Coast either in the event of a "dissolution or winding up of the organization" or should First Baptist "cease to be a Southern Baptist Church."
Following a bench trial, the trial court found in favor of Central Coast. The court found that First Baptist had "ceased to function as a Southern Baptist Church," and that it had "de facto dissolved." Based on these findings, the court ordered enforcement of the reversionary clause in First Baptist's constitution, and ordered the transfer of First Baptist's assets to Central Coast.
First Baptist and New Life appeal. They argue first that the court lacked jurisdiction to determine whether First Baptist had ceased to be a Southern Baptist church, because this required the court to decide matters involving religious doctrine and practice, thus violating fundamental precepts of separation of church and state contained in the First Amendment to the United States Constitution, as well as in our California Constitution. Appellants further contend that the trial court erred in finding that First Baptist "ceased to function as a Southern Baptist Church" rather than "cease[d] to be a Southern Baptist Church," which was the language of the reversionary clause.
In addition, appellants contend that the court's findings that First Baptist ceased to function as a Southern Baptist church and that it had "de facto dissolved" were not supported by the evidence and that dissolution of a religious corporation such as First Baptist must comply with statutory formalities.
Appellants further contend that the court erred by failing to include in its order and judgment that all of First Baptist's debts and liabilities be paid before transferring its assets to Central Coast, as provided in the reversionary clause. Finally, New Life contends that, since the two causes of action against it were dismissed prior to trial, the court's judgment against it was in error.
After a careful review of the extensive body of law on the subject of jurisdiction of civil courts over church property disputes, we have concluded that the court in this case did not have jurisdiction to determine whether First Baptist had "cease[d] to be a Southern Baptist Church." Resolution of this issue necessarily required the court to decide issues involving religious doctrine, polity, and practice, an undertaking forbidden by the First Amendment.
We find, however, that the court did have jurisdiction to inquire into the alternate basis stated in the reversionary clause, namely whether there had been a "dissolution or winding up of the organization." This determination did not involve the court in any religious issues. The record shows that a faction of First Baptist *107 members proceeded on a course of conduct that violated its own constitution, bylaws and rules of order. To the extent that Southern Baptist churches are dedicated to the principle of democratic governance, and without touching upon matters of faith, we believe the record supports the court's finding that First Baptist "ceased to function as a Southern Baptist Church," by violating the rules set forth in its own constitution and bylaws for orderly government of its affairs. In addition, the last vote of the entire First Baptist membership at a regularly noticed meeting on March 24, 2004, was to dissolve and wind up the affairs of the corporation and to transfer its assets to Central Coast under the reversionary clause contained in article VII, section 3, of the First Baptist constitution. Therefore, although the formalities of corporate dissolution were not completed, we conclude that the record supports the court's finding that First Baptist had "de facto dissolved."
We further find no error in the language of the judgment ordering the transfer of First Baptist's assets to Central Coast. The court's judgment ordered transfer of the assets "under Article VII, Section 3, of the [First Baptist] Constitution." This order necessarily included the language contained in the reversionary clause in article VII, section 3, which defined the assets to be transferred as "assets [of First Baptist] remaining after payment of, or provision for payment of, all debts and liabilities of the organization."
Finally, we find that judgment against New Life on the cause of action for declaratory relief was supported by the record, notwithstanding the dismissal of two other causes of action against it, since New Life was included in the declaratory relief cause of action and was a party to an outstanding preliminary injunction regarding the subject property.
We will therefore affirm the judgment.

BACKGROUND
First Baptist was founded in 1964 as a nonprofit religious corporation. Its articles of incorporation state that its primary purpose is "to operate and maintain a Baptist Church." The corporation owns real property located near Watsonville, at the intersection of Hall Road and Sill Road.[1] The church building, with attached offices, is on this property, as are two residential buildings. The founder of the church, Zeb Wilson, bought the church property and built the church.
Although First Baptist, like other Southern Baptist churches, is autonomous and independent, its governing documents pledge its cooperation with its local association of Southern Baptist churches, which is Central Coast, as well as with the Southern Baptist Convention of California and the national Southern Baptist Convention. The constitution of First Baptist sets forth its object and purpose: "The object of this church shall be to preach the Gospel of Christ and to extend His kingdom at home and abroad, to cooperate with the Central Coast Southern Baptist Association,[2] the Southern Baptist Convention of California, and the Southern Baptist Convention, and to promulgate the spirit of missions as found in Matthew 28:16-20."
In keeping with these purposes, the bylaws of First Baptist provide that the pastor of the church "shall be committed to the work of the Southern Baptist Convention in its world-wide program of missions *108 and shall lead the church in cooperating with the work of its local association and the state and national conventions of Southern Baptists." First Baptist has been associated with Central Coast since its inception in 1964.
Article VII, section 3, of the First Baptist constitution contains the reversionary provision that is at the heart of this dispute: "`The property of this organization is irrevocably dedicated to religious purposes and no part of the net income or assets of this organization shall ever inure to the benefit of any private person. Upon the dissolution or winding up of the organization, or should it cease to be a Southern Baptist Church, its assets remaining after payment of, or provision for payment of, all debts and liabilities of the organization, shall be given to the Central Coast Southern Baptist Association, which is organized and operated exclusively for religious purposes and which has established its tax exempt status related to section 501(c)(3) of the Internal Revenue Code.'"
The phrase "or should it cease to be a Southern Baptist church" was added to the First Baptist constitution in 1986, after the pastor at that time attempted to transform First Baptist into an independent Fundamentalist Baptist church. Central Coast became involved in the dispute, and a Christian arbitration was held. The arbitrators determined that the attempt to change denominations was invalid because it had not been put to a vote of all active members of the' church. After a vote was properly taken, the members decided to keep First Baptist a Southern Baptist church. The members of First Baptist then asked Central Coast to help them strengthen the constitution in order to avoid other takeover attempts in the future. This resulted in the language "or should it cease to be a Southern Baptist Church" being added to article VII, section 3, of the constitution.
The First Baptist constitution provides that First Baptist is to be governed by its members. "[E]ach member present is entitled to vote on all matters that come before the church for action, except as state[d] in the by-laws." The constitution and bylaws provide for regular business meetings and allow for special meetings as necessary, upon notice by announcement in the church bulletin, at two consecutive services or by contacting "all the active membership." Minutes are kept for all business meetings. Article III, section 3, of the constitution expressly adopts Roberts Rules of Order as the rules governing the transaction of church business. There was undisputed testimony at trial that a distinguishing feature of Southern Baptist churches is their commitment to the democratic process of making decisions. Each member is entitled to have a right to speak and be heard before votes are taken on issues affecting the affairs of the church. The membership elects three trustees, who are authorized to sign any legal document affecting church property, but do not have any power to transfer church property without a vote of the membership.
First Baptist has suffered declining membership since it was founded over 40 years ago. In 2004, when the problems leading to this action began to develop, there were only 10 members, including Pastor John Jackson and his wife Emillie Jackson. Because it had so few active members, First Baptist struggled to meet operating costs. The three trustees in 2004 were Larry Wilson, Bonnie Caudill, and Luther Burbank.
Some time in the summer of 2003, Bonnie Caudill suggested to Pastor Jackson that because of dwindling membership and church finances, "it might be well for him to start looking for another church, another *109 position." On January 28, 2004, Pastor Jackson was informed by the "pulpit committee" that First Baptist could no longer afford to pay his salary. He was given notice that his employment would end on February 29, 2004, with an additional 30 days of severance pay.
The constitution of First Baptist does not give authority to any committee to hire or to terminate the employment of a pastor. It provides that the pastor must be elected by a two-thirds majority vote of the members. In this case, the pulpit committee, consisting of six members of First Baptist, was given the task in 1999 of finding suitable candidates for pastor. Jackson was found and a unanimous membership voted him to be pastor at that time. In 2004, two of the former members of the pulpit committee no longer belonged to First Baptist, and another had passed away. Thus, only three First Baptist members, Bonnie Caudill and two others, made the decision to inform Pastor Jackson on January 28, 2004, that his employment was being terminated. There was no regular business meeting, discussion, or vote of the entire membership prior to the termination of Pastor Jackson. Several members, including trustee Wilson, who was the son of church founder Zeb Wilson, were not informed that Pastor Jackson was being terminated.
Around this time, Bonnie Caudill was in contact with a member of New Life Community Church who had previously been a member of First Baptist. Caudill learned that New Life, a nondenominational church, was outgrowing its temporary quarters and was looking for a permanent space in the area to hold its services. Since First Baptist had a church building, but had only a few active members and could no longer afford to pay their pastor, and New Life had a growing congregation and a pastor but no church building, Caudill thought that joining forces could benefit both groups. On February 2, 2004, Caudill held a meeting at her house that included several members of First Baptist, Pastor Hank Holley (Holley) of New Life, and two New Life elders, in order to explore the possibility of a relationship between First Baptist and New Life. Holley was given a copy of the First Baptist constitution and bylaws. The meeting at Caudill's house was not a regular or special business meeting of First Baptist. No notice had been given to the membership.
After the February 2, 2004 meeting, and again without a vote of the membership of First Baptist, Caudill consulted with her attorney about the options that had been discussed, and retained the attorney on behalf of First Baptist. The attorney prepared a Memorandum of Understanding (MOU) providing that First Baptist would transfer its assets to New Life and the two churches would merge as of March 1, 2004. Caudill delivered a copy of the MOU to Holley. After a meeting of the elders of New Life on February 23, 2004, representatives of New Life signed the MOU. The minutes for the New Life elders meeting on that day indicated that since the merger would be effective on March 1, 2004, New Life should prepare to take over the utilities at the First Baptist church property, get a new telephone number for the merged entity, and "change the signage to reflect New Life Community Church." Arrangements were made to construct the new sign. Holley returned two copies of the signed MOU to Bonnie Caudill for First Baptist representatives to sign. Caudill represented to him that the membership of First Baptist supported the plan set forth in the MOU and that First Baptist was prepared to move ahead with it.
Meanwhile, Pastor Jackson had informed Dr. Michael Stewart (Stewart), Director of Missions at Central Coast, that *110 he had been terminated as pastor of First Baptist and that there were "rumors swirling as to the future of the church." Stewart talked to Bonnie Caudill and learned that there had been no church business meeting to terminate Pastor Jackson. He also talked with trustee Wilson, who was not aware that Pastor Jackson had been terminated. Stewart then met informally with Pastor Jackson, Emillie Jackson, trustee Wilson and another First Baptist member, Jane Home. The Jacksons and Wilson had heard that another church, which was not a Southern Baptist church, was poised to take over First Baptist. Because of concerns that the termination of Pastor Jackson had not been accomplished in accordance with the constitution and bylaws of First Baptist, and that the full membership was not being included in plans for the future of First Baptist, Stewart asked Pastor Jackson to call a special meeting of the church membership to discuss the situation. This meeting was set for February 26, 2004.
Although the entire membership of First Baptist had been informed of the February 26, 2004 meeting, the only members who attended, in addition to Stewart, were the same four who had previously met with Stewart. Other than identifying the names of New Life and Pastor Holley, these four members of First Baptist had "very little information." They did, however, express to Stewart that rather than have First Baptist taken over by a non-Southern Baptist church, they would prefer that First Baptist dissolve and the assets be transferred to Central Coast, to be retained for a Southern Baptist ministry. Stewart asked Pastor Jackson to set another special business meeting after Sunday services on February 29, 2004.
On February 29, 2004, Pastor Jackson attempted to conduct a business meeting of the membership of First Baptist after the church service, over the objection of Bonnie Caudill. Stewart was not present, but George Yates from Central Coast attended the meeting and offered to help the membership clarify what they wanted to do. Several people, including trustee Wilson and Emillie Jackson, expressed that they wanted the church to dissolve and the assets to be transferred to Central Coast, in accordance with the First Baptist constitution. Others, such as Bonnie Caudill and her husband, supported the proposed merger with New Life. Yates expressed his opinion that if a Southern Baptist church merged with a non-Southern Baptist church, one or both would have to dissolve. The Caudills disagreed. They explained that it had been agreed with the people from New Life that the church would continue to be Southern Baptist after the merger. No decisions were made and no vote was taken at the February 29, 2004 meeting.
The following day, March 1, 2004, Stewart and Pastor Jackson visited the members of First Baptist in order to poll each member individually about their desires and intentions for the future of First Baptist. They did not go to the Caudills' home, because Mrs. Caudill had told them she would be unavailable, and they did not visit one other member who was at work. They took with them a petition stating that the signors agreed to wind up the affairs of the church according to its constitution, and further agreed to keep Pastor Jackson on as pastor of First Baptist for three months. Of the seven members they saw, five members, including two trustees, signed this document.
Stewart then arranged a meeting the next day, March 2, 2004, with Pastor Holley of New Life, in order to discuss New Life's intentions with respect to First Baptist. Holley said that he had read the First Baptist constitution and was aware *111 that if First Baptist dissolved, its assets would go to Central Coast. Holley indicated he would not be interested in a landlord/tenant arrangement with Central Coast. Stewart said that he had the signatures of five members of First Baptist who did not want to merge with New Life, but would rather dissolve First Baptist. Holley responded that he had his own legal document. He had brought the MOU with him, but he did not tell Stewart about it or show it to him. He did not tell Stewart about New Life's plans to move to the First Baptist church property. Holley simply told Stewart that he had been invited to be a "guest preacher" at First Baptist on March 7, 2004.
The day after this lunch meeting with Pastor Holley, Stewart was made aware by his office staff of New Life's internet website. This website announced "We're Moving!" The location of New Life's "new church building" was the First Baptist church. The announcement invited all New Life members to meet at the property on March 3 and March 6 "for cleaning and preparation for our first worship service there March 7th." On March 6, in addition to the cleaning, New Life members would be "painting and erecting our new sign at the church building" and "sprucing up and rearranging the inside of the building." Another page of the website explained: "New Life Community Church is on the move! God has graciously provided us with a permanent home at the intersection of Hall Road and Sill Road.... Our first worship service in our new building will be Sunday, March 7th, followed by a pot-luck lunch at the church." The New Life website described New Life as an "independent, non-denominational church."
When Stewart read this, he realized that Holley had known of these plans the day before, when they had lunch together. At this point, Stewart concluded that a "takeover attempt of the church was underway." Stewart contacted Central Coast's attorneys and asked them to prepare a letter to Pastor Holley. This letter, dated March 5, 2004, informed Holley that under the provisions of First Baptist's constitution and bylaws, he and his church had no legal right to claim ownership of the assets of First Baptist or to use the premises. The letter quoted the portions of the constitution and bylaws providing that if First Baptist ceased to be a Southern Baptist church, all of its assets would pass to Central Coast. It advised Holley that any attempt by New Life to obtain the assets of First Baptist or to use the premises as its church would force Central Coast to file suit. The attorney asked Holley to provide a copy of "any Memorandum of Understanding or related documents that you believe support your group's claim to the [First Baptist] assets or premises." The letter referred specifically to New Life's website announcing that it had a new "permanent home" at the First Baptist church, and asked Holley to delete all references on this website to the First Baptist church property as New Life's permanent home.
After reading this letter, Holley informed his congregation not to go to the First Baptist church for the cleaning and painting party, and he decided not to preach there on Sunday, March 7, 2004. He testified that he "didn't want to get involved in a controversy." A copy of the March 5, 2004 letter was also delivered to Bonnie Caudill. Upon receiving it, she contacted Holley and asked him to return to her any copies of the MOU that he had kept. He did so. Caudill testified that she then threw away the originals and all copies of the MOU.
In the meantime, Pastor Jackson had written a letter to the First Baptist membership, dated March 2, 2004, calling a *112 special business meeting for Saturday, March 6, 2004. This letter set forth a motion that would be presented to the membership at this meeting. The proposed motion was to wind up the affairs of First Baptist in accordance with its constitution, and to ask Central Coast to continue Baptist mission work at the site, including encouraging the start of a new Spanish-speaking Southern Baptist church and allowing for other ministries such as New Life to rent the facilities if they wished to do so. The motion also proposed to extend Pastor Jackson's severance pay for three months. The letter indicated that five First Baptist members had already agreed to the proposed motion.
After receiving this letter Bonnie Caudill collected the votes of seven First Baptist members opposing Pastor Jackson's motion. The seven members included one who had withdrawn his vote from Stewart's petition, on the basis that he felt he had been "pressured," and another member who later acknowledged that she probably did not meet the requirements for active membership. The document signed by these seven people on March 5, 2004, stated that they disagreed with Pastor Jackson's motion, and that they did "not want to wind up the affairs or dissolve the church as stated in Article VII section 3 of the Constitution and Bylaws, or otherwise." They did "not want the Church to close its doors."
Stewart presided over the membership meeting on March 6, 2004. He explained Central Coast's legal position, and shared with the membership a copy of the New Life website, which they had not seen, announcing that New Life was moving into the First Baptist property on a permanent basis. Only a few people knew Pastor Holley and no one acknowledged authorizing him and his church to take over the First Baptist premises and put up a new sign. Stewart encouraged the members to vote to dissolve First Baptist. After some discussion, a vote was taken, and the members voted six to three not to dissolve the church.
From discussions that followed between Stewart and various First Baptist members in the ensuing weeks, it developed that the members basically had two concerns: they wanted the church to continue as a Southern Baptist church, and they could no longer afford to maintain the property and pay a pastor. Another noticed membership meeting was set for March 24, 2004, to discuss how these goals could be met.
At the March 24, 2004 meeting, nine members of First Baptist were present. Stewart and the attorney for Central Coast were also present. The attorney explained to the membership why a deed restriction prohibiting the sale of the property to anyone other than Central Coast would not be a workable solution. She further explained that dissolving the corporation did not mean closing the doors of the church. If the First Baptist corporation dissolved and its assets were transferred to Central Coast, Central Coast would hold the assets and property in trust and continue to operate the church as a Southern Baptist church. The members could continue to hold worship services there and choose their own pastor. And all responsibilities and liabilities would belong to Central Coast. Stewart and the attorney for Central Coast left open the possibility that the members could also invite Pastor Holley to conduct worship services there.
Stewart and the attorney for Central Coast left the room while the members had a discussion and took a vote. Eight of nine members voted to dissolve the corporation and to transfer the church property *113 of First Baptist to Central Coast for continued use as a Southern Baptist church. They signed a document stating that they agreed "to continue the process of dissolution and winding up of the corporation but not the church pursuant to Article VII Section 3 of the Constitution and Bylaws of First Baptist Church of Las Lomas. Pursuant to Article VII Section 3 of the Constitution and Bylaws, the real property at 47 Sill Road, Watsonville will be transferred to the Central Coast Baptist Association for the continued use as a Southern Baptist Church." The italicized words "but not the church" were inserted into the typed document at the request of the members. The document further stated that no new members would be admitted until the property transfer was complete, and that Central Coast agreed not to sell the property.
After the resolution to dissolve the corporation was signed on March 24, 2004, Bonnie Caudill contacted Pastor Holley and told him everything was "`all worked out.'" They agreed to meet on March 27, 2004 at the Caudills' house. Pastor Holley and four elders from New Life attended this meeting, along with Caudill and five other members of First Baptist. They reviewed the document signed on March 24, 2004, and Holley expressed the belief that if the corporation dissolved and Central Coast took over the property, there could be no joint ministry of New Life and First Baptist as they had discussed. Caudill and the other First Baptist members at this meeting began to be concerned about the meaning of what they had signed, and Caudill again visited her attorney. The attorney prepared another resolution rescinding the resolution of March 24, 2004, and agreeing instead to a deed restriction. Six members of First Baptist, including two trustees, signed this resolution on April 1 and April 2, 2004. This was accomplished without a noticed business meeting of all of the membership.
The attorneys for Central Coast had proceeded to prepare the documents necessary for formal dissolution of the corporation and transfer of its assets in accordance with the March 24, 2004 resolution. On March 31, 2004, Central Coast's attorney sent a letter to Bonnie Caudill, with the pertinent documents attached, inviting her to review these with her attorney. In response, Caudill's attorney, purporting to represent the trustees of First Baptist, sent a letter to Central Coast, enclosing the rescission and the resolution proposing a deed restriction rather than dissolving the corporation. Stewart discovered that there had been no noticed business meeting including all members of First Baptist prior to the purported rescission of the March 24 resolution, and the signing of the new resolution. He then made inquiries and determined for himself that New Life was not prepared to take the necessary steps to become a Southern Baptist church if it were to merge with First Baptist. He concluded that a takeover by New Life was again in progress.
On April 13, 2004, the executive board of Central Coast made a determination that First Baptist had "ceased to function as a Southern Baptist Church," and the board voted unanimously to attempt to protect the property of First Baptist by enforcing the constitutional provision regarding the transfer of First Baptist property to Central Coast.
On April 30, 2004, there was another meeting at the Caudills' house, attended by a faction of First Baptist members, Pastor Holley and the elders from New Life, to discuss the two churches joining to worship together. This was not a regularly noticed membership meeting. The result of this meeting was a resolution by First Baptist inviting New Life to worship *114 jointly with them at the First Baptist church facilities, and inviting Pastor Holley to speak at the joint worship services. Under this resolution, all collections and donations at the services were to go to New Life.[3] New Life was to pay all expenses of the services and maintaining the church property, other than taxes and insurance. Rental income generated by the two residential buildings on the church property would be retained by First Baptist. And the arrangement could be terminated at any time by a vote of the majority of the First Baptist members. The elders of New Life accepted this invitation. The resolution was signed by six First Baptist members, including two trustees, effective May 1, 2004. The New Life website again announced that church's "new location" at the First Baptist property.
Central Coast filed this lawsuit against First Baptist, New Life and Pastor Holley on May 7, 2004. The complaint alleged intentional and negligent interference with prospective economic advantage against Pastor Holley and New Life. In addition, it sought declaratory relief and specific performance of the reversionary provision of the First Baptist constitution, on the basis that First Baptist had ceased to be a Southern Baptist church and had de facto dissolved. Pastor Holley was served with the complaint on May 7, 2004. Defendants answered the complaint and First Baptist also filed a cross-complaint against Central Coast for declaratory relief, seeking a judicial determination that First Baptist had not ceased to be a Southern Baptist church and had not dissolved.
Joint worship services conducted by Pastor Holley were held at First Baptist on successive Sundays on May 9, May 16, and May 23, 2004. At the May 23, 2004 services, three new members, all from New Life, were admitted as members of First Baptist, over the objection of Jackson, who still attended services although he no longer led them. The three new First Baptist members also retained their membership in New Life. On Sunday, May 30, 2004, nine First Baptist members, including the three new members, extended the call to Holley to become a member and to be pastor of First Baptist. At a special business meeting on June 9, 2004, Pastor Holley was installed as pastor of First Baptist.
On June 8, 2004, Central Coast filed a motion for a temporary restraining order and preliminary injunction to prevent any new members from being added to First Baptist after the date the suit was filed May 7, 2004, to prevent the installation of Pastor Holley as pastor of First Baptist, and to prevent any amendment to the First Baptist constitution. On July 16, 2004, the parties appeared and argued the motion for a preliminary injunction. Counsel stipulated to an injunction prohibiting any transfer or encumbrance of First Baptist property. The injunction was filed on August 3, 2004, preventing Holley and New Life from asserting any control over First Baptist assets or property.
Prior to trial, the two causes of action for interference with economic advantage were dismissed. A court trial on the specific performance and declaratory relief causes of action began on June 6, 2005, and proceeded for nine days. On September 1, 2005, the court filed its ruling in favor of Central Coast. First Baptist requested a statement of decision on numerous identified issues and the court ordered Central Coast to prepare a statement of *115 decision. On October 4, 2005, the court filed the statement of decision and judgment. After vacating the judgment to consider objections to the statement of decision, the court entered its amended statement of decision and judgment on January 31, 2006. The court resolved the issues in favor of Central Coast and against First Baptist and New Life. The court found that First Baptist had "ceased to function as a Southern Baptist Church" and had "de facto dissolved," and ordered that its assets be transferred to Central Coast pursuant to the First Baptist constitution and bylaws.
First Baptist and New Life appealed.

ISSUES
Appellants contend that a key determination in this case, namely whether First Baptist had "cease[d] to be a Southern Baptist Church," was a question involving religious doctrine, polity, and practice, and that the trial court could not resolve this issue without violating fundamental constitutional principles guaranteeing separation of church and state. In the alternative, appellants contend that the court's finding that First Baptist "ceased to function as a Southern Baptist Church" departed significantly from the language of the reversionary clause in article VII, section 3, of the First Baptist constitution, and in addition was not supported by the evidence.
As stated in the reversionary clause and framed by the complaint and cross-complaint for declaratory relief in this case, the issue before the court was whether First Baptist had "cease[d] to be a Southern Baptist Church." Although Central Coast's complaint, and the trial court's statement of decision, quote this language from article VII, section 3, and refer to it repeatedly, both the complaint and the statement of decision also use the language "ceased to function as a Southern Baptist Church." To the extent that these phrases are used as if they were interchangeable, we do not agree that they are synonymous. The issue before the court concerned the precise language in the First Baptist constitution, namely whether First Baptist "cease[d] to be a Southern Baptist Church," so as to trigger the reversionary clause and compel the transfer of First Baptist's assets to Central Coast. The court's statement of decision, notwithstanding the imprecision of its language, reflects that the court considered this issue, and found that the reversionary clause applied and that the assets must be transferred to Central Coast. We will therefore first address the question whether the court had jurisdiction to decide whether First Baptist ceased to be a Southern Baptist church. We will conclude that the court did not have jurisdiction because the resolution of the question whether First Baptist had ceased to be a Southern Baptist church required the court to become involved in evaluating and deciding matters of religious doctrine, polity and practice.
Appellants also challenge the court's finding that First Baptist had "de facto dissolved." They argue that dissolution of a religious corporation can only be accomplished through a formal, statutorily mandated, procedure. And even if a de facto dissolution is deemed to be possible for a religious corporation, appellants contend that the finding that First Baptist de facto dissolved was not supported by the evidence in this case.
We believe the court's finding that First Baptist had "de facto dissolved," and to some extent its finding that First Baptist had "ceased to function as a Southern Baptist Church," addressed questions whether First Baptist as an organization was operating consistently with its principle of government and in accordance with *116 its articles of incorporation, constitution, bylaws and rules of order. The court could undertake such an inquiry without intruding into matters involving religious doctrine, polity and practice, by applying neutral principles of law. We find that the evidence supported the court's findings that First Baptist had ceased to function as a Southern Baptist church, by departing from the democratic process and violating its constitution, bylaws and rules of order, and also that the evidence supported the court's finding that First Baptist had "de facto dissolved" by voting to dissolve at a regularly scheduled meeting of the membership on March 24, 2004.
Appellants contend that the trial court did not follow the language of article VII, section 3, of the First Baptist constitution when it ordered First Baptist to transfer its assets to Central Coast without specifically including that "all debts and liabilities of the organization" must first be paid. We agree that debts must be paid but we believe this is provided for by the court's specific reference in the judgment to the transfer of First Baptist's assets "under Article VII Section 3" of the First Baptist constitution.
Finally, appellant New Life contends that the causes of action against it were dismissed at trial and that the judgment against it is in error. As to this contention, we will conclude that the record supports the inclusion of New Life in the judgment.

Standards of Review
The question whether the court acted outside the limits proscribed by the First Amendment in resolving issues based on religious doctrine and practice is a question of law, involving the application of legal principles grounded in constitutional precedent. (Concord Christian Center v. Open Bible Standard Churches (2005) 132 Cal.App.4th 1396, 1407-1408, 34 Cal. Rptr.3d 412 (Concord Christian); Singh v. Singh (2004) 114 Cal.App.4th 1264, 1274-1281, 9 Cal.Rptr.3d 4; Metropolitan Philip v. Steiger (2000) 82 Cal.App.4th 923, 928-932, 98 Cal.Rptr.2d 605.) We therefore review the jurisdictional issue de novo.
To the extent that we interpret and construe the written documents central to this dispute, including First Baptist's articles of incorporation, constitution, and bylaws, this also involves an independent review, applying well established rules of contract interpretation. (Concord Christian, supra, 132 Cal.App.4th at p. 1408, 34 Cal.Rptr.3d 412.) However, to the extent that the court below made factual findings by resolving evidentiary disputes, our review of those findings is pursuant to the substantial evidence rule. (Ibid.) "Under that standard, we must consider all the evidence in the light most favorable to the prevailing parties, giving them the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (Id. at pp. 1408-1409, 34 Cal.Rptr.3d 412.)

I. Did The Court Have Jurisdiction to Decide Whether First Baptist Ceased to Be a Southern Baptist Church?
Resolution of this issue requires that we first summarize the principles governing the jurisdiction of civil courts of law over church property disputes.

Principles of Jurisdiction in Church Property Cases
The establishment clause of the First Amendment to the United States Constitution, as well as its California counterpart (Cal. Const., art. I, § 4), precludes civil courts from adjudicating property disputes based on religious doctrine. (Jones *117 v. Wolf (1979) 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775.)[4] A court may apply neutral principles of law to resolve church property disputes, so long as the court stays free from "entanglement in questions of religious doctrine, polity and practice." (Id. at p. 603, 99 S.Ct. 3020.) "[N]o every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without `establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." (Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church (1969) 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (Hull Church).) "[E]cclesiastical matters include not only issues of religious doctrine per se, but also issues of membership, clergy credentials and discipline, and church polity and administration." (Concord Christian, supra, 132 Cal.App.4th at p. 1411, 34 Cal.Rptr.3d 412.)
The "'neutral principles of law'" approach, referred to by the high court in Hull Church, relies on "`objective, well-established concepts of trust and property law familiar to lawyers and judges.'" (Jones v. Wolf, supra, 443 U.S. at p. 611, 99 S.Ct. 3020.) It generally involves the evaluation of such sources as deeds, articles of incorporation, church constitutions and rules, and statutory law. (Id. at p. 604, 99 S.Ct. 3020; Korean United Presbyterian Church v. Presbytery of the Pacific (1991) 230 Cal.App.3d 480, 507-508, 281 Cal.Rptr. 396 (Korean United), disapproved on another point in Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 739, 29 Cal.Rptr.2d 804, 872 P.2d 143.) "In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." (Jones v. Wolf, supra, 443 U.S. at p. 604, 99 S.Ct. 3020.)
What constitutes the authoritative ecclesiastical body in a church depends upon the church's organization and structure (or its "polity"). In the seminal case of Watson v. Jones (1871) 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666, the United *118 States Supreme Court identified two categories of church polity: hierarchical and congregational. In a hierarchical organization, "the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." (Id. at pp. 726-727.) The Presbyterian church is an example of this type of organization. In this system of ecclesiastical government there is an ascending hierarchy of authoritative bodies, known as "judicatories," which issue orders and entertain appeals from the decisions of those below. (Id. at p. 727.) "[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (Ibid; Wheelock v. First Presbyterian Church (1897) 119 Cal. 477, 482, 51 P. 841 (Wheelock ) [decisions of highest judicatory of church "are binding and conclusive upon courts wherever and whenever material to pending litigation."])
In churches of a congregational organization, the local church is independent, "governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government." (Watson v. Jones, supra, 80 U.S. at p. 724.) "[E]ach local group is in charge of all of its affairs through majority vote of its members and there is no control from above." (Rosicrucian Fellowship v. Rosicrucian Fellowship Non-Sectarian Church (1952) 39 Cal.2d 121, 133, 245 P.2d 481.) Such a church "has no tribunal but the Congregation." (Providence Baptist Church v. Superior Court (1952) 40 Cal.2d 55, 61, 251 P.2d 10 (Providence Baptist).) "If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property." (Watson v. Jones, supra, 80 U.S. at p. 725.) Baptist churches traditionally fall within this category.
In cases where disputes over civil or property rights are involved in churches of congregational organization, a court may apply neutral principles of law to determine whether the bylaws and rules were being properly observed by those governing the churchfor instance, whether meetings were conducted or elections were held in accordance with the applicable rules or pertinent principles of law. (Providence Baptist, supra, 40 Cal.2d at pp. 61, 63, 251 P.2d 10.) In other words, a court may assist "the appropriate body of the church ... in acting within its proper sphere, according to its rules and regulations, to protect civil and property rights." (Id. at pp. 63-64, 251 P.2d 10.) As with church property disputes involving hierarchical churches, however, courts must refrain from involvement with any controversy based on religious dogma, such as "whether the pastor was preaching a theology contrary to the denominational doctrine or conducting religious services in a manner out of harmony with the ritual of the church." (Id. at p. 63, 251 P.2d 10.) In such cases "it would clearly not be within the province of a court to interfere, and the controversy would have to be settled by the church tribunals." (Ibid.; see also Hull Church, supra, 393 U.S. at pp. 445, 449, 89 S.Ct. 601.)
Just prior to oral argument in this case, Division Three of the Fourth Appellate District of the Court of Appeal filed its opinion in Episcopal Church Cases (2007) 152 Cal.App.4th 808, 61 Cal.Rptr.3d 845, which set forth a comprehensive summary of the development of the law regarding *119 jurisdiction of church property disputes. Episcopal Church Cases involved a church of hierarchical organization and is not directly applicable to the case before us. But its significance is to clarify and reaffirm the well-established principles of constitutional law governing jurisdiction of church property disputes and to emphasize the rule of stare decisis that binds us to follow this precedent.
The court in Episcopal Church Cases relied on a line of consistent California Supreme Court authority, which it referred to as the Baker-Wheelock line,[5] noting that the California Supreme Court had taken its cue from the United States Supreme Court in Watson v. Jones, supra, 80 U.S. 679, in applying the "principle of government" as the guiding principle for civil courts addressing church property disputes. Under this approach, which we have summarized above, the court considers the authoritative governing body of the church. If the principle of government in a church is that the majority of the congregation is the decision-making body, courts must defer to the decisions of that body. A court may act to ensure that the governing body adheres to the acknowledged rules by which it conducts its affairs, and may assist in interpreting governing documents, so long as this undertaking does not require the court to inquire into religious doctrine. (Providence Baptist, supra, 40 Cal.2d at p. 63, 251 P.2d 10; Watson v. Jones, supra, 80 U.S. at p. 723.) In a hierarchically organized church, the local congregation is governed by the larger religious organization and both the congregation and the court are bound by the decisions and orders of the highest church judicatory. (Watson v. Jones, supra, 80 U.S. at p. 723.) The principle of government approach does not preclude a court from applying neutral principles of law to resolve a church property dispute; however, "general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues." (Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc. (1970) 396 U.S. 367, 370, 90 S.Ct. 499, 24 L.Ed.2d 582 (cone. opn. of Brennan J.) (Eldership).)
With these principles in mind, we turn to the case before us.

Application of Jurisdictional Principles
There is no dispute in this case that First Baptist is an independent autonomous church. It is governed by its members, who conduct all affairs of the church in accordance with the rules set forth in its constitution and bylaws. In the Southern Baptist polity, each local church, while independent, can affiliate with its local association of Southern Baptist churches, as well as seeking recognition as a Southern Baptist church at the state and national Southern Baptist conventions. The relationship between a particular church and the local, state and national associations is a cooperative one, with a general purpose to pool resources and to work together to further Southern Baptist mission work. Unlike the judicatories in the Presbyterian church, the three Southern Baptist associations do not exercise authority or control over each other or over the local church. The bylaws of Central Coast provide: *120 "`This association is a cooperative body, and shall never exercise any ecclesiastical authority over any church, or attempt to interfere in any way with the legitimate functions of any church, but shall always cheerfully recognize the independence of the churches.'" As we have explained in the previous section, in a church of congregational organization, the membership of the local church is the "authoritative ecclesiastical body" to which courts must defer for the resolution of religious doctrinal issues. (Jones v. Wolf, supra, 443 U.S. at p. 604, 99 S.Ct. 3020.)
Here the church property dispute turns on the reversionary provision in article VII, section 3, of the First Baptist constitution, which provides as follows: "Upon the dissolution or winding up of the organization, or should it cease to be a Southern Baptist Church, its assets remaining after payment of, or provision for payment of, all debts and liabilities of the organization, shall be given to the Central Coast Southern Baptist Association, ..." In property disputes, courts are well-equipped to interpret documents such as deeds, or the constitution, bylaws, and articles of incorporation of an organization, by applying well-established neutral principles of property law. "Again, however, general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues. For example, provisions in deeds or in a denomination's constitution for the reversion of local church property to the general church, if conditioned upon a finding of departure from doctrine, could not be civilly enforced." (Eldership, supra, 396 U.S. at p. 370, 90 S.Ct. 499 (cone. opn. of Brennan, J.).)
Applying these rules to the case at hand, it becomes clear that the determination whether First Baptist "cease[d] to be a Southern Baptist Church," so as to trigger the reversionary clause in its constitution, to some extent required the court to involve itself in questions of religious doctrine, polity and practice. For instance, it appears the court was asked to decide, on the basis of conflicting evidence, what doctrines or practices characterize a Southern Baptist church as such, and then to evaluate the actions taken by First Baptist and New Life in order to determine whether First Baptist had substantially departed from such doctrine, and if so whether this departure was so significant that First Baptist could no longer be considered "to be a Southern Baptist Church." In our view, the court could not conduct this inquiry without delving into "matters at the very core of a religionthe interpretation, of particular church doctrines and the importance of those doctrines to the religion." (Hull Church, supra, 393 U.S. at p. 450, 89 S.Ct. 601.) "Plainly, the First Amendment forbids civil courts from playing such a role." (Ibid.)
In its supplemental briefing in response to Episcopal Church Cases, where the court disagreed with several Court of Appeal cases on the basis that they had not adhered to California and United States Supreme Court precedent, Central Coast appears to have retreated to some extent from several arguments initially made in this case. We respond to those arguments briefly here. For instance, the fact that Baptist churches do not have high judicatories similar to Presbyterian churches does not allow courts to step in to resolve church property disputes by applying general principles of law. In a church of congregational organization, the congregation is the highest tribunal. (Providence Baptist, supra, 40 Cal.2d at p. 61, 251 P.2d 10.) Where religious doctrine underlies the property dispute a civil court may not involve itself. "[N]o matter whether the religious organization is hierarchical *121 or congregational, it is clear that the decision of the highest religious tribunal on questions of discipline, faith, or ecclesiastical rule, custom, or law must be accepted." (Singh v. Singh, supra, 114 Cal.App.4th at p. 1280, 9 Cal.Rptr.3d 4.)
Furthermore, cases relied on by Central Coast that have applied theories of express or implied trust to resolve church property disputes are not controlling here. Courts can apply these theories to settle property disputes, without touching upon the nature of a religious controversy, in circumstances where church canons or rules create an express trust on property of a local church in favor of a superior general church, or where such a trust can be implied from the governing documents of the local church or general church or from the hierarchical nature of the church's organization. (See Protestant Episcopal Church v. Barker (1981) 115 Cal.App.3d 599, 171 Cal.Rptr. 541 (Barker) [express trust found in reversionary clause in the documents of both the general church and the subordinate parish church]; Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik (2004) 118 Cal.App.4th 919, 13 Cal.Rptr.3d 552 (Guardian Angel) [governing documents of both national church and member church provide for a trust in favor of the national church where local church holding property severs its ties].) Here, because First Baptist is an autonomous and independent church, and not a member or constituent of a "`superior religious body or general church,'" no reversionary interest in favor of a general church can be presumed. (See Korean United, supra, 230 Cal.App.3d at p. 508, 281 Cal.Rptr. 396 [presumptive trust created in church property of a subordinate church in favor of a general church due to express provisions in canons of general church]; see also, Corp.Code, § 9142, subd. (c)(2).)
Moreover, in the cases which have applied trust theories to settle church property disputes, the local church or parish had clearly disaffiliated, or sought to disaffiliate, from the general church of which it was a member. (Barker, supra, 115 Cal.App.3d 599, 171 Cal.Rptr. 541 [local parish disaffiliated and seceded from the general church]; Korean United, supra, 230 Cal.App.3d 480, 281 Cal.Rptr. 396 [dissident faction renounced its membership in the national denomination]; Guardian Angel, supra, 118 Cal.App.4th 919, 13 Cal.Rptr.3d 552 [local church parish severed its ties with national church].) There was thus no issue as to whether the event triggering the reversionary interest had occurred. Here, on the other hand, First Baptist does not desire to remove itself from Southern Baptist life, and does not seek to disaffiliate or cease being a Southern Baptist church. Although there is an express reversionary clause in favor of Central Coast in the First Baptist constitution and bylaws, "[o]nly express conditions that may be effected without consideration of doctrine are civilly enforceable." (Eldership, supra, 396 U.S. at p. 369, fn. 2, 90 S.Ct. 499.) The reversionary clause here operates to transfer property only upon one of two conditionseither First Baptist dissolves and winds up its affairs, or First Baptist ceases to be a Southern Baptist church. Deciding whether the second contingency has occurred clearly involves the court in a consideration of church doctrine.
Central Coast contends that the evidence supported the court's finding that First Baptist ceased to be a Southern Baptist church by engaging in certain conduct, such as terminating its Southern Baptist pastor, negotiating to transfer its assets to a nondenominational church, inviting that church to conduct a joint ministry on the First Baptist church premises, and failing to cooperate with Central Coast and to *122 have its pastor "lead the church in cooperating with the work of its local association," as provided in First Baptist's constitution and bylaws. However, there was testimony from other experts on Southern Baptist life as to the meaning and effect of this conduct, how a Southern Baptist church can cease to be a Southern Baptist church, and what practices define a "genuine" Southern Baptist church. The fact that there was a significant amount of evidence introduced at this trial regarding Southern Baptist doctrine, practice and church polity, only emphasizes the point that the resolution of this conflict impermissibly involved the court in deciding a controversy of a religious nature.
For instance, Stewart, who was the Director of Missions at Central Coast, testified that when First Baptist acted contrary to its constitution, and when it stopped cooperating with Central Coast, it ceased to be a Southern Baptist church. In his opinion, the vote by the board of Central Coast that First Baptist had "ceased to function as a Southern Baptist Church" determined that First Baptist was no longer a Southern Baptist church. However, another Central Coast witness stated that it was not the intention of Central Coast by this vote to declare that First Baptist had ceased to be a Southern Baptist church. And the former Director of Missions for Central Coast, who was responsible for adding the language "or should it cease to be a Southern Baptist Church" to the First Baptist constitution, testified that in his opinion the only way that First Baptist could cease to be a Baptist church would be if the membership so voted.
Dr. Larry Lewis, President of the Home Mission Board of the National Southern Baptist Convention (Lewis), testified that the local association of Southern Baptist churches does not decide when a church ceases to be a Southern Baptist church. A local association can withdraw its fellowship with a church, but only the national convention can determine whether a church is or is not a participating Southern Baptist church. As far as he was aware, First Baptist was still recognized by the national convention, and was therefore still a Southern Baptist church.
Stewart testified that in his opinion First Baptist ceased to be a Baptist church when a merger was contemplated with New Life, a nondenominational church. He explained that although New Life had indicated an intention to become a Southern Baptist church, he did not believe New Life was prepared to do what was necessary to become Southern Baptist. He spoke of various practices and beliefs that he felt New Life was unwilling to embrace, which would prevent it from being identified as Southern Baptist.
There was other testimony, however, that the missions of New Life and First Baptist are doctrinally aligned. Lewis had reviewed New Life's statement of faith and he concluded that it was "very consistent with what we would find in most Southern Baptist Churches." In Lewis's opinion, New Life was a church of "like faith and order," even though it styled itself a nondenominational church. Pastor Holley had a long history of Southern Baptist affiliation. From discussions with Holley, Lewis believed that Holley's intention was that New Life, if it merged with First Baptist, would become a cooperating Southern Baptist church at all levels. Holley himself testified that the ultimate goal of the merger was to be one "large united Southern Baptist church." He stated that his church was "identical in faith and practice to First Baptist," and that many of its members, including himself, had been baptized in a Southern Baptist church. There was also evidence that New Life had recently voted to become a Southern Baptist *123 church and that it had been recognized by the national convention.
Another expert, Pastor Dewey Squyres, testified that in his opinion the state and national conventions would not seat a representative from First Baptist if the issue were brought before the credentials committees of these conventions. In Squyres's opinion, First Baptist had ceased to be a Baptist church by violating its constitution when it attempted to merge with a nondenominational church, by accepting members who were "non-immersed members," and by electing a pastor who was not prepared to "lead the church in cooperating with the work of its local association and the state and national conventions of Southern Baptists." Holley testified, on the other hand, that he was entirely willing to cooperate with the Southern Baptist associations, including Central Coast. However, by the time he was called to be pastor at First Baptist, he and First Baptist and New Life were all defendants in a lawsuit brought by Central Coast. Holley explained that he had not attended any meetings at Central Coast because he had not been invited to any.
Lewis testified that it was not uncommon for two struggling churches to merge, even though one was a Southern Baptist church and the other was of a different denomination, provided that the merged church indicated a commitment to Southern Baptist causes. Lewis testified as to his understanding that New Life had recently indicated such a commitment and that both New Life and First Baptist were recognized by the national convention as Southern Baptist churches. Lewis testified further that there is no particular rule against a person being a member of a Southern Baptist church and simultaneously being a member of another church, and that the membership of a Southern Baptist church is entitled to call any member to become their pastor, and can even call a pastor who is not a member.
The California Southern Baptist Convention had written a letter in June of 2004, stating that it no longer recognized First Baptist as a "cooperating Baptist Church" because it had not contributed to the convention in recent years and had not participated in other activities. Squyres testified that in his opinion a church was not a "genuine Southern Baptist Church" if it was not cooperating with the local, state and national associations. However, Lewis testified that many churches are unable to contribute to the local, state or national associations and that this does not mean the church has ceased to be a Southern Baptist church.
As we have discussed above, the establishment clause of the First Amendment precludes a civil court from weighing such evidence in order to assess the relative significance in Southern Baptist life of certain tenets or practices, to determine whether First Baptist's attempts to revitalize its church by joining with another church caused it to cease to be a Southern Baptist church, or to resolve what one expert witness described as "the mystery of Southern Baptist polity." Courts have consistently held that a civil court of law violates the First Amendment when it entangles itself in "questions of religious doctrine, polity and practice." (Jones v. Wolf, supra, 443 U.S. at p. 603, 99 S.Ct. 3020.) We believe the question whether First Baptist had ceased to be a Southern Baptist church was such a question. The First Amendment thus required the trial court to defer to the highest ecclesiastical body of the church, which in this case was the First Baptist membership.
The record is clear that there was never a decision by the membership of First Baptist to cease being a Southern Baptist *124 church. Rather the evidence was that the members of First Baptist embraced the Southern Baptist faith and practice and have continually declared that they consider First Baptist to be a Southern Baptist church. They wanted to continue their church in the Southern Baptist faith. Some believed that the merger with New Life was a means to that end. Because there was no decision by the congregation of First Baptist to cease being a Southern Baptist church, and because determination of the question by the trial court was dependent on the resolution of conflicting evidence involving religious doctrine and practice, we conclude, based on the principles we have summarized and applied above, that the trial court did not have jurisdiction to make a determination whether First Baptist had "cease[d] to be a Southern Baptist Church" under article VII, section 3, of its constitution.
However, article VII, section 3, provided alternative grounds that could trigger the reversionary clause: either First Baptist ceased to be a Southern Baptist church, or "upon the dissolution or winding up of the organization." We turn to this second ground next.

II. Did the Evidence Support the Court's Finding of a De Facto Dissolution of the Corporation?
Although a civil court may not interfere in a property dispute that involves it in religious doctrine, it is well within the province of courts to determine whether a religious corporation has acted in accordance with its governing rules and regulations, and if it has not, what the resulting effect on civil and property rights shall be. (Providence Baptist, supra, 40 Cal.2d at p. 63, 251 P.2d 10; Bouldin v. Alexander (1872) 15 Wall. 131, 82 U.S. 131, 21 L.Ed. 69; Concord Christian, supra, 132 Cal.App.4th at pp. 1414-1418, 34 Cal. Rptr.3d 412.) Thus, court oversight is proper where the question is "whether the property and funds of the church are being handled in accordance with the by-laws and rules of the church corporation or such by-laws and rules are being properly observed by the governing body of the church, ..." (Providence Baptist, supra, 40 Cal.2d. at p. 64, 251 P.2d 10.) And a court may determine "whether a meeting was properly called or conducted" (ibid.), or whether a church complied with the notice and voting requirements of its own bylaws and what the effect is of unauthorized actions. (Concord Christian, supra, 132 Cal.App.4th at p. 1414, 34 Cal.Rptr.3d 412.) In a church of congregational organization, although the majority of the membership is the authoritative body that makes decisions for the church, the majority must adhere to the rules governing the organization. (Bouldin v. Alexander, supra, 15 Wall. 131, 82 U.S. 131.)
Here the court made findings, based on the evidence and the relevant documents, that First Baptist was not conducting its affairs in accordance with the governing rules set forth in its constitution and bylaws. The constitution of First Baptist declares in its preamble that it is established in part "so that this body may be governed in an orderly manner." It provides, in article III, section 4, that the membership is the governing body of the church and that "each member present is entitled to vote on all matters that come before the church for action," with certain limited exceptions. Article VI of the constitution provides that business meetings of the membership shall be held on a regular basis and that "[s]pecial business meetings shall be called as the Church deems necessary." These are to be noticed "by putting the announcement in the church bulletin, by announcing it in two regular services, or contacting all the active membership." A quorum consists of *125 those attending the business meeting, provided that the meeting "has been properly called." In article III, section 3, the First Baptist constitution expressly adopts Robert's Rules of Order to guide its business transactions. Properly noticed meetings are a key feature of Robert's Rules of Order. Article III of the bylaws further provides that any expenditures must be authorized by a two-thirds majority vote of the members at a regular or special business meeting, and article VII provides that transfer of any church property must be by a vote of the membership.
Here, First Baptist's pastor was notified he had been terminated by a minority of members, without noticing a regular business meeting and without providing the opportunity for a discussion and vote of all the members. Several church members were not even aware that the pastor had been terminated. Again without a membership meeting or a vote of the members, a faction of the First Baptist membership retained counsel, negotiated with another church identifying itself as nondenominational, and presented that church with a proposed agreement to transfer First Baptist property and assets to the nondenominational church. Also without a meeting, and without a vote of all the members, a faction of First Baptist members invited the nondenominational church to use First Baptist church property to conduct joint services, and agreed that money collected at these services would go to the nondenominational church.
Article V, section 2, of the First Baptist constitution provides that church officers shall be elected by a majority vote of the membership, and the bylaws provide that all church officers, which includes the pastor, must be members. The pastor must be elected by a two-thirds vote. Article IV of the constitution provides for specific methods by which new members can petition to become members of First Baptist, and article II of the bylaws provides that membership is to be granted to new members by a majority vote, with special provisions if there is an objection. According to the record, these rules of procedure were not followed when the three members from New Life were accepted as new members of First Baptist, over the objection of a First Baptist member. Since the votes of these three new members were crucial to the vote calling Pastor Holley to be pastor of First Baptist, that action was also accomplished outside of the rules and regulations governing First Baptist in conducting its affairs.
The effect of decisions made and actions taken in violation of the constitution, bylaws and rules of governance of a church entity is that such actions are void and of no effect. Concord Christian, supra, 132 Cal.App.4th 1396, 34 Cal.Rptr.3d 412 is illustrative. In that case the court found that a church's attempted withdrawal of its affiliation with a national church violated mandatory requirements for notice contained in the bylaws of both the local and the general church. The disaffiliation was therefore ineffective. The court further found that the local church's subsequent attempts to ratify its action "by majority vote at an unnoticed meeting of the handpicked membership" were likewise ineffective. (Id. at p. 1417, 34 Cal. Rptr.3d 412; see also Providence Baptist, supra, 40 Cal.2d at p. 63, 251 P.2d 10 [resolution purporting to remove pastor was "irregular and of no effect"]; Guardian Angel, supra, 118 Cal.App.4th at p. 927, 13 Cal.Rptr.3d 552 [election of a church board violated rules requiring diocesan approval and therefore all subsequent acts of the board were "unauthorized and consequently a nullity"]; Bomar v. Mt. Olive Missionary Baptist Church (1928) 92 Cal.App. 618, 268 P. 665 [transfer of *126 church property without authorization of properly held membership meeting is voidable].)
Central Coast contends that the various acts and decisions of First Baptist in violation of its own constitution and bylaws were not only of no effect, but also amounted to a "constructive dissolution" of the organization, sufficient to trigger the reversionary clause in article VII, section 3. The concept of "constructive dissolution" was recognized in Barker, supra, a case involving parish churches that seceded from the general church. In Barker, the court found that the disaffiliation and secession of a local church, over the objection of the general church, constituted a revocation of the local church's charter by the general church. Applying former Corporations Code section 9802, which provided that a religious organization dissolved upon the revocation or surrender of its charter, the court in Barker concluded that there had been a "constructive dissolution" under the circumstances. (Barker, supra, 115 Cal.App.3d at p. 626, 171 Cal.Rptr. 541.)
Barker is not directly applicable to the case before us. Corporations Code section 9802 was repealed in 1978 and in any case would not apply to First Baptist, which is not a "subordinate body of a national body" and does not have a charter. (Barker, supra, 115 Cal.App.3d at p. 625, 171 Cal.Rptr. 541.) However, as Barker illustrates, the concept of constructive or de facto dissolution of a charitable corporation is not unprecedented in the law. For instance, in Queen of Angels Hospital v. Younger (1977) 66 Cal.App.3d 359, 136 Cal. Rptr. 36, the court found that a hospital that operated outside its governing articles of incorporation was subject to losing its assets to successor distributees under a succession clause that operated in the event of "dissolution or abandonment." (Id. at p. 366, fn. 1, 136 Cal.Rptr. 36.) The court found that if the hospital "cease[d] to perform the primary purpose for which it was organized," the succession clause would be triggered. (Id. at p. 368, 136 Cal.Rptr. 36.) Central Coast argues that here First Baptist had similarly ceased to perform the primary purpose identified in its articles of incorporation, namely to "operate and maintain a Baptist Church," when a faction of its members commenced negotiations to transfer its assets to a nondenominational church, and violated its constitution and bylaws as described above.
The question whether First Baptist had ceased to "operate and maintain a Baptist Church" may again involve the court in deciding what is or is not a Baptist church, an issue that implicates First Amendment concerns. However, the court could find, and did find, that the conduct summarized above demonstrated that First Baptist had failed on numerous occasions to function within the governing rules contained in its constitution and bylaws. While this evidence tends to support the court's finding that First Baptist had "de facto dissolved," the determining factor, in our view, is that the membership of First Baptist voted, at a properly noticed meeting on March 24, 2004, to dissolve the corporation and to transfer the assets to Central Coast. The record supports the court's finding that the business meeting on March 24, 2004 was a "constitutionally noticed business meeting," and that the First Baptist membership voted at that meeting to "continue the process of dissolution and winding up of the corporation." The process had previously been initiated by a petition that Stewart and Pastor Jackson had taken to individual members on March 1, 2004, which set forth article VII, section 3 of the constitution and provided that those signing it agreed to wind up the affairs of the church within the meaning of this provision. *127 Five members signed this petition on March 1, 2004, although one later withdrew. The March 1, 2004, petition was not the result of a noticed membership meeting.
At the meeting on March 24, 2004, which was a noticed membership meeting, the record shows that nine out of the ten active members of First Baptist were present and had the opportunity to discuss the issue, and that eight members voted (with one abstention) to continue with the process of "dissolution and winding up of the corporation, but not the church, pursuant to Article VII of Section 3 of the Constitution and Bylaws of the First Baptist Church of Los Lomas." The members specifically agreed that, pursuant to article VII, section 3, of the constitution, "the real property at 47 Sill Road, Watsonville will be transferred to the Central Coast Baptist Association for the continued use as a Southern Baptist Church." They signed a document memorializing this vote. As we have discussed in the preceding section, in a congregationally organized church, courts must defer to the decisions of the majority, if lawfully made. "If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the (Watson v. Jones, supra, 80 U.S. at p. 725.) Here the members voted to dissolve the corporation, and specifically agreed that the property be transferred to Central Coast so that it could be used as a Southern Baptist church.
First Baptist argues that this vote was the result of coercive tactics on the part of Central Coast. However, the trial court heard the testimony on this issue. The record shows that after an initial discussion of issues, Stewart and the attorney for Central Coast left the room so that the members could discuss the matter amongst themselves and take a vote. After a vote was taken Stewart and the attorney rejoined the meeting, and the members signed a short two-sentence document indicating their agreement to dissolve the corporation and transfer First Baptist's assets to Central Coast pursuant to article VII, section 3 of the First Baptist constitution. The members wanted to add several provisions. They wanted to add language clarifying that the corporation was dissolving, "but not the church." They wanted to add that the transfer of property to Central Coast was to be "for the continued use as a Southern Baptist Church." And they wanted to add specific language providing that Central Coast "shall not sell the property." These interlineations were added to the typed document and after each change the resolution was read out loud, after which the members initialed all the changes. This record does not reflect coercion by Central Coast. Substantial evidence supports the court's finding that this was a valid vote of the First Baptist membership and that it took place at a "constitutionally noticed meeting."
First Baptist argues further that the vote to dissolve the corporation was later rescinded. Here again, the record supports the court's finding that the decision of First Baptist to dissolve the corporation and transfer its assets to Central Coast was never "amended, modified, or rescinded at another noticed business meeting." After discussing their decision with Pastor Holley, some of the First Baptist members apparently determined to rescind the March 24, 2004 vote. A "Resolution of the Members of the First Baptist Church of Las Lomas," which purported to rescind the March 24, 2004 decision, was prepared by Caudill's attorney. Although four First Baptist members signed it on April 1, 2004, and two other signatures *128 were obtained the next day, there is no indication in the record that there was any meeting or discussion including all of the First Baptist members prior to this document being prepared and signed. A church that is governed by the rule of majority cannot proceed by taking votes of a majority of "handpicked" members at an unnoticed meeting. (Concord Christian, supra, 132 Cal.App.4th at p. 1417, 34 Cal. Rptr.3d 412.) The purported rescission was therefore of no effect.
The same is true of all subsequent actions at First Baptist. For instance, a "Resolution of the Members of the First Baptist Church of Las Lomas," dated May 1, 2004, which invited New Life and its pastor to conduct joint services at the First Baptist facilities, and which set forth various terms of agreement between the two churches, was also of no effect. The same "handpicked" First Baptist members signed this agreement, also prepared by Caudill's attorney, and there is no indication in the record that a meeting of all of the members of First Baptist was duly noticed, according to the constitution and bylaws, or that all of the members were given an opportunity to be heard regarding the proposed use of the property by New Life. The later admission of three new members from New Life, over objections, not only violated the express constitutional provisions for accepting new members, but was also in direct violation of the agreement reached at the March 24, 2004 membership meeting that "[n]o further members of the First Baptist Church of Las Lomas will be admitted until the real property transfer has been completed." And the subsequent election of Pastor Holley, which included the votes of these three members, was invalid as well.
Given the evidence that a faction of First Baptist violated various provisions of its constitution and bylaws in the conduct of its affairs, including terminating its pastor, admitting new members, and electing a new pastor, that decisions were being made regarding the use of church property without noticed meetings or a vote of the full membership, and that the last valid decision made at a noticed meeting by a membership vote was to dissolve the corporation and wind up its affairs, we conclude that the court's finding that First Baptist had "de facto dissolved" was supported by substantial evidence in the record. This finding supports the court's order to enforce the reversionary clause contained in article VII, section 3, of the First Baptist constitution, despite the failure to complete the formalities of dissolution required by the Corporations Code.
We note that the dissolution of the corporation does not mean that the church itself ceases to exist. The corporation, even if composed of all of the members of the church, is "a body separate and distinct from the church proper." (Wheelock, supra, 119 Cal. at p. 486, 51 P. 841; see also Berry v. Society of St. Pius X (1999) 69 Cal.App.4th 354, 372, 81 Cal. Rptr.2d 574 ["a religious organization of church members or congregants coexists with the corporate entity"].) The Corporations Code permits religious bodies to incorporate, but incorporation is "only permitted as a convenience to assist in the conduct of the temporalities of the church," such as holding title to property. (Wheelock, supra, 119 Cal. at p. 483, 51 P. 841.) "The corporation is a subordinate factor in the life and purposes of the church proper." (Ibid.)
The March 24, 2004 vote taken by the membership of First Baptist, to dissolve the corporate entity and transfer the property to Central Coast "for the continued use as a Southern Baptist Church," addressed the concerns expressed by the members of First Baptist, as reflected in *129 the record. Faced with a dwindling congregation and financial resources, they sought to be relieved of the burden of managing the church property while at the same time ensuring that it would continue to be used for a Southern Baptist ministry. Enforcing the provision of article VII, section 3, of the First Baptist constitution, in accordance with the membership vote at a properly noticed meeting, accomplishes these goals.

III. Provision for Payment of Debts
First Baptist argues that if this court affirms the ruling of the trial court to enforce the reversionary clause and to order the assets of First Baptist transferred to Central Coast, the trial court must include in its order the specific language of article VII, section 3, which provides that First Baptist's "assets remaining after payment of, or provision for payment of, all debts and liabilities of the organization, shall be given to Central Coast Southern Baptist Association...." The judgment as written provides simply that "[First Baptist] is required under Article VII Section 3 of the [First Baptist] Constitution to transfer forthwith the assets to [Central Coast]."
First Baptist contends that the judgment must be reversed and modified so that the language contained in article VII, section 3, regarding payment of debts and liabilities prior to the transfer of assets can be added. We do not believe it is necessary to include this language in the judgment. The judgment provides for transfer of the assets "under Article VII Section 3," and that section of the First Baptist constitution describes the assets as "assets remaining after payment of, or provision for payment of, all debts and liabilities of the organization." We agree with First Baptist that its debts or liabilities must be paid, or provision made for the payment thereof, prior to the transfer of assets to Central Coast. This is also required by the Corporations Code. (Corp. Code, §§ 9680, subd. (e); 6713.) We do not believe, however, that the judgment must be amended to include the insertion of this specific language from article VII, section 3. The court's reference to that provision in First Baptist's constitution suffices to identify how the assets are to be transferred.

IV. The Judgment Against New Life
New Life argues that the judgment against it must be reversed because it was dismissed from the lawsuit and thereafter no relief was sought against it.
Two causes of action, alleging negligent and intentional interference with prospective economic advantage against Holley and New Life, were dismissed prior to trial. The remaining two causes of action, for specific performance and declaratory relief, did not name any particular defendant. At trial the court acknowledged the dismissal of the first two causes of action and initially agreed that New Life and Holley were no longer parties defendant. However, counsel for Central Coast then pointed out that New Life and Holley were still parties to the injunction that was in place. The trial court made no further comment. New Life and Holley were never dismissed from the lawsuit.
The complaint alleged that New Life was in possession of the property that was the subject of the lawsuit. The fourth cause of action for declaratory relief specifically mentioned New Life, alleged that First Baptist contended it was "free to transfer the Property to [New Life], a nondenominational Church," arid asked in part for a declaration that any distribution of First Baptist's assets to New Life was unauthorized. The preliminary injunction, which was in effect throughout the trial, *130 enjoined defendants, specifically including New Life and Holley, from asserting any authority over First Baptist property.
After the proposed statement of decision and judgment were filed, New Life objected to being included in the judgment on the ground that it had been dismissed from the action. At the hearing on the objections to the proposed judgment and statement of decision, Central Coast argued that New Life was a proper defendant on the fourth cause of action for declaratory relief, which specifically mentioned New Life. The court entered judgment against New Life on the declaratory relief cause of action, finding, as requested in Central Coast's declaratory relief cause of action, that "distribution of [First Baptist] Assets to [New Life] is unauthorized, and not in furtherance of the religious purposes of the corporation." Under these circumstances, we believe the court's inclusion of New Life as a defendant in the judgment on the declaratory relief action was supported by the record.

DISPOSITION
The judgment is affirmed.
WE CONCUR: McADAMS and DUFFY, JJ.
NOTES
[1] Two addresses are used: 215 Hall Road and 47 Sill Road.
[2] The Central Coast Southern Baptist Association was the predecessor of Central Coast Baptist Association.
[3] Caudill testified that First Baptist members could contribute separately to First Baptist if they wished.
[4] The establishment clause of the First Amendment to the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ..." It is applicable to the states through the Fourteenth Amendment. Section 4 of article I of the California Constitution provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed... . The Legislature shall make no law respecting an establishment of religion."
[5] Baker v. Ducker (1889) 79 Cal. 365, 21 P. 764; Wheelock v. First Presbyterian Church of Los Angeles, supra, 119 Cal. 477, 51 P. 841; Horsman v. Allen (1900) 129 Cal. 131, 61 P. 796; Permanent Committee of Missions v. Pacific Synod of Presbyterian Church (1909) 157 Cal. 105, 106 P. 395; Rosicrucian Fellowship v. Rosicrucian Fellowship Nonsectarian Church, supra, 39 Cal.2d 121, 245 P.2d 481; Providence Baptist Church v. Superior Court, supra, 40 Cal.2d 55, 251 P.2d 10.