Filed 7/30/25  Wimber v. Scott CA4/3

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CAROL WIMBER et al., | |
| Plaintiffs and Appellants, | G064170 |
| v. | (Super. Ct. No. 30-2022-01291272) |
| ALAN SCOTT et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge. Affirmed.

Tyler Law, Robert H. Tyler and Nathan R. Klein for Plaintiffs and Appellants.

[*]  Only parts I, II, and III of the Statement of Facts, part I of the Discussion, and the Disposition are certified for publication. (Cal. Rules of Court, rules 8.1105(b) & 8.1110.)

Snell & Wilmer, Steven T. Graham, Howard M. Privette and Jing (Jenny) Hua for Defendants and Respondents Alan Scott, Kathryn Scott, Jeremy Riddle, Katie Riddle, Gregory Scherer, Banning Leibscher and Julian Adams.

Brown & Streza, Casey S. Hale, John C. Peiffer II, Heather A. Lachenauer and Paul Daniel Schmitt for Defendant and Respondent Dwelling Place Anaheim formerly known as Vineyard Christian Fellowship of Anaheim.

\*　　　\*　　　\*

Appellants are congregants of Dwelling Place, a church formerly known as Vineyard Christian Fellowship of Anaheim. Vineyard Christian Fellowship of Anaheim was part of an association of Protestant churches called Vineyard USA. In 2018, the church offered the position of senior pastors to Alan Scott and Kathryn Scott (the Scotts). In 2022, the Scotts disassociated the church from Vineyard USA and formed their own church, Dwelling Place. Appellants filed a complaint alleging the Scotts only claimed they were committed to Vineyard USA so they could obtain the position of senior pastors, take control of the church's assets, and start their own movement.

The trial court sustained respondents' demurrers to the complaint with leave to amend, ruling the complaint violated respondents' First Amendment rights. Appellants filed a first amended complaint framing the dispute as one centered on church property, as opposed to doctrine, but the court again sustained respondents' demurrers; this time, without leave to amend. Appellants contend this was error.

Upon our de novo review, we conclude the complaint does not state any causes of action. Appellants do not have standing to bring claims on

behalf of the church and have not stated sufficient factual allegations to form a cause of action for individual claims. Moreover, even if the complaint alleged sufficient facts to state a cause of action, the case could not go forward as it infringes on the respondents' First Amendment rights. Therefore, we affirm the judgment.

STATEMENT OF FACTS[1]

I.

THE PARTIES

Plaintiffs Carol Wimber, Steve Bray, Nancy Bray, Stephanie Rupp, David Edmondson, Lance Pittluck, Don Salladin, Joe Gillentine, and James Gillentine (collectively, Appellants) filed a lawsuit in their individual capacities and on behalf of Dwelling Place Anaheim formerly known as Vineyard Christian Fellowship of Anaheim (Dwelling Place).[2]

As alleged, Carol Wimber was an active and tithing member of Dwelling Place, while Stephanie Rupp, Steve Bray, Nancy Bray, and David Edmondson were active associate and tithing members. Lance Pittluck, Don Salladin, Joe Gillentine, and James Gillentine, at the time of the Scotts' alleged misrepresentations, were members of the board of directors. They are not currently on the board.

---

[1] Because we accept Appellants' factual allegations in their complaint as true, our statement of facts is a summary of the relevant allegations taken from the first amended complaint. (*Schmier v. City of Berkeley* (2022) 76 Cal.App.5th 549, 553, fn. 4 ["we do not concern ourselves with the plaintiff's ability to prove its factual allegations"].)

[2] Appellants refer to the church as Vineyard Anaheim while respondents refer to it as Dwelling Place. We refer to the church as Dwelling Place as that name reflects the most recent articles of incorporation.

Appellants named Alan Scott, Kathryn Scott, Jeremy Riddle, Katie Riddle, Gregory Scherer, Banning Leibscher, and Julian Adams as individual defendants and named Dwelling Place as a defendant and a nominal defendant (collectively, Respondents).

Alan Scott is the current senior pastor and chairman of the board of directors. He is Kathryn Scott's husband; she is the current co-senior pastor and is a current member of the board of directors. Jeremy Riddle, Katie Riddle, Greg Scherer, Banning Leibscher, and Julian Adams are current members of the board of directors.

Appellants alleged seven causes of action: (1) fraud, individually and on behalf of Dwelling Place, against the Scotts; (2) negligent misrepresentation, individually and on behalf of Dwelling Place, against the Scotts; (3) breach of oral contract, on behalf of Dwelling Place, against the Scotts; (4) breach of fiduciary duty, on behalf of Dwelling Place, against Respondents; (5) declaratory relief against Respondents; (6) permanent injunction against Respondents; and (7) constructive trust against Respondents.

II.

DWELLING PLACE'S CORPORATE STRUCTURE

Dwelling Place is a California nonprofit religious corporation. John Wimber originally incorporated it in 1979 under the name "Calvary Chapel of Yorba Linda/Placentia." It was formed for the "specific and primary purpose[]" of "proclaim[ing] the good news of salvation by faith in our Lord Jesus Christ by any suitable method or media . . . ." In 1983, John Wimber filed an amended articles of incorporation changing the name to "Vineyard Christian Fellowship of Anaheim." In 2023, Alan Scott filed an amended articles of incorporation changing the name to "Dwelling Place Anaheim."

4

Dwelling Place's bylaws differentiate between "Voting Members" and "Associate Members." "Voting Members" are those "who from time to time are the members and Officers of the Board of Directors of [the] corporation in the capacity of President, Vice President, and Treasurer. "Members who are not voting members shall be associate members." Associate members may attend meetings but cannot elect members to the board of directors.

The board of directors serves under the leadership of the senior pastor, who is the president of the board of directors. The board of directors is the governing body "in respect to matters concerning business being done by the corporation (i.e., financial investment, buying or leasing of facility, maintenance, contract negotiation, etc.)." The senior pastor controls the "general supervision, direction, and control of the business and affairs of the corporation." The senior pastor has the "ultimate responsibility" in "[a]ll ecclesiastical matters relating to the church, including but not limited to matters of doctrine and interpretation, matters of spiritual ordinances for the church, direction of ministry and discernment for initiating and determining ministry activities, and other matters reasonably connected to the spiritual leadership of the church . . . ." In case of a vacancy, a search committee, comprised of four board members, four senior level pastors, and two lay leaders, is responsible for appointing the senior pastor. Only a three-quarters vote of the board of directors and a three-quarters vote of the congregation can terminate the senior pastor.

III.

THE VINEYARD MOVEMENT

In the late 1970's, John Wimber, Carol Wimber's late husband, founded what is known as the "Vineyard Movement," "a spiritual awakening"

focused on the "development of modern worship music, and John Wimber's endorsement of congregational participation, described colloquially as 'Doin' The Stuff.'" The Vineyard Movement emerged on the scene in the late 1970's, at what had been called a "'crossroads' of American Christianity and culture."

By 1982, there were seven "'Vineyards' in a loose-knit fellowship of churches including [Dwelling Place]." John Wimber was recognized as the leading pastor of the Vineyard Movement. His influences "profoundly shaped the theology and practice of Vineyard churches, from their earliest days until his death in November 1997." "His desire was to keep the Vineyard Movement living in the tension of the 'radical middle,' embracing both the gifts of the Evangelical tradition and the gifts of the Pentecostal/Charismatic traditions."

In 1990, John Wimber led a pledge drive from the pulpit of Dwelling Place with the goal "to raise funds to build a sanctuary that would serve both the local church [Dwelling Place] and serve as a conference center for the benefit of the Vineyard Movement at large." John Wimber represented "that the funds would be used for the benefit of the international affiliation of Vineyard churches and the Vineyard Movement at large." "Steve Bray donated over $500,000 . . . to [Dwelling Place] over the years, with the understanding his contributions were being used to further the Vineyard Movement and Vineyard USA based on representations made by John Wimber and [church] leadership when said donations were solicited."

The Vineyard Movement grew into a national association of churches known as Vineyard USA. As of January 2018, Dwelling Place was Vineyard USA's flagship church. Vineyard USA's purpose was to "'plant[] churches by the hundreds around the world and establish[] "outposts of the kingdom of God"—where the poor are cared for, the sick are healed, God is

6

experienced in worship, and Christians are called to "do the stuff" that Jesus did.'"

The Scotts were former pastors of a Vineyard church in Ireland. In 2017, they left that church and moved to the United States. After leaving, and unbeknownst to Appellants, the Scotts expressed to a senior associate pastor at Dwelling Place their dissatisfaction with the Vineyard Movement and Vineyard USA. Alan Scott explained "he had no intent to continue affiliating with Vineyard USA and the Vineyard Movement . . . due to his dissatisfaction with the organization." Alan Scott wanted to launch a new church which did not affiliate with Vineyard USA.

In April 2017, Alan Scott questioned this senior associate pastor about Dwelling Place's assets. Alan Scott learned Dwelling Place had more than $55 million in real property and at least $19 million in the bank.

In May 2017, Alan Scott met with Vineyard USA's then existing national director and discussed his intention to disassociate with the Vineyard Movement and Vineyard USA. He provided the national director with a letter in which he stated, "we love each of the leaders, we just wished they loved each other well. Since that isn't the story at the moment, it's not an environment where we would want to plant our lives or raise our girls. And so after 29 years of connection with the tribe, we have arrived at the painful conclusion that we won't be part of a local vineyard church in the next part of our journey."

In December 2017, Dwelling Place's senior pastor, Lance Pittluck, resigned. Dwelling Place assembled the search committee and started the process of interviewing for a new senior pastor. Appellants allege that after learning of Dwelling Place's substantial assets, and despite his

dissatisfaction with the Vineyard Movement, Alan Scott applied to serve as senior pastor.

The search committee and the board of directors questioned the Scotts as to their commitment to Vineyard USA and the Vineyard Movement. The search committee and the board wanted to ensure the new senior pastor would continue to use Dwelling Place's assets for the benefit of Vineyard USA and the Vineyard Movement. During their interview, Alan Scott represented he was "'Vineyard through and through,'" a statement which members of the Vineyard Movement used to express commitment to the Vineyard Movement. Alan Scott also represented that "'Due to the historical nature of this church and out of honor to John and the Wimber family, I would never take this house out of the Vineyard Movement.'" Alan Scott told the search committee he would consider the appointment as senior pastor to be for "'the rest of [his] life.'" Throughout the interview process, the Scotts made it clear they would keep Dwelling Place and its assets in the Vineyard Movement and in Vineyard USA. Dwelling Place offered the position of senior pastors to the Scotts.

The Scotts did not disclose their dissatisfaction with the Vineyard Movement to the search committee or the board. They concealed their true intention to use Dwelling Place's assets to fund their own movement. Appellants allege that had the Scotts disclosed their intentions and dissatisfaction, they would not have been hired as senior pastors.

From 2019 to 2021, Alan Scott reconstituted the board of directors so it was comprised of directors who would not challenge his actions or take steps to reduce his authority over the church. In February 2022, Alan Scott announced the church was leaving the Vineyard Movement and Vineyard USA. He was taking its assets, approximately $62 million at that

time, to start and fund a new movement. Alan Scott did not disclose to anyone in the congregation his plan to disassociate. Alan Scott claimed God told him to leave the Vineyard Movement and Vineyard USA with its millions of dollars in assets. Appellants allege the then board of directors ratified this decision.

Appellants complain that taking Dwelling Place's assets and devoting them to a different church contradicts the entire purpose for which donations were solicited from and contributed by them. Appellants continued tithing after the Scotts took over with the expectation the church would continue to be a part of the Vineyard Movement. If they had known the Scotts intended to remove the church from the Vineyard Movement and Vineyard USA, they would not have continued tithing. Further, allowing Dwelling Place to use the church building and financial accounts to start and fund a new religious movement is a breach of trust.

To remedy their injuries, they sought, among other things, the imposition of a trust over Dwelling Place's assets in favor of the Vineyard Movement and Vineyard USA, an order obligating the Scotts to specifically perform under the terms of their oral agreement to keep Dwelling Place a part of the Vineyard Movement and Vineyard USA, and damages in the amount of at least $62 million.

DISCUSSION

On review of a trial court's order sustaining a demurrer, "'we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory . . . .'" (*John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2024) 16 Cal.5th 1003, 1013.) "'[W]e assume that the complaint's properly pleaded material allegations are true and give the complaint a reasonable interpretation by

9

reading it as a whole and all its parts in their context.'" (*Id.* at p. 1008.) "'"We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law."'" (*Ibid.*) A complaint which "reveals a lack of standing to sue 'is vulnerable to a general demurrer on the ground that it fails to state a cause of action.'" (*Brown v. Crandall* (2011) 198 Cal.App.4th 1, 8.)

## I.

### APPELLANTS DO NOT HAVE STANDING TO
### RAISE CLAIMS ON BEHALF OF DWELLING PLACE

We start by addressing the claims Appellants raised on Dwelling Place's behalf. Appellants alleged causes of action for fraud, negligent misrepresentation, breach of oral contract, and breach of fiduciary duty on behalf of Dwelling Place. As we explain, the law does not allow these plaintiffs to do so.

"It is a fundamental principle of corporate governance that the role of managing the business of the corporation is vested in its board of directors, not in its shareholders." (*Bader v. Anderson* (2009) 179 Cal.App.4th 775, 787.) "This responsibility includes the prosecution, defense, and control of corporate litigation." (*Ibid.*) Given the responsibility bestowed upon the directors, "where conduct, including mismanagement by corporate officers, causes damage to the corporation, it is the entity that must bring suit; the individual shareholder may not bring an action for indirect personal losses . . . sustained as a result of the overall harm to the entity." (*Id.* at p. 788.) In situations where the directors fail to act, "a shareholder has a sufficient interest in the entity 'to justify the bringing of a "propulsive" action, designed to set in motion the judicial machinery for the redress of the wrong to the corporation. [Citations.]'" (*Id.* at pp. 788–789.)

10

But religious organizations, such as Dwelling Place, are a different species of corporation. They do not have shareholders as they are not profit-seeking. Instead, they are organized pursuant to California's Nonprofit Corporation Law, specifically that part devoted to Nonprofit Religious Corporations (NRC). (Corp. Code,[3] § 9110.) They have a corporate structure with a board of directors but are formed to further religious purposes, not financial ones. (§§ 9111, 9151, subd. (a).) In what situations then can an individual compel a lawsuit on behalf of a nonprofit religious corporation, such as a church? The NRC carefully circumscribes the answer.

First, a "member" or "former member" can bring a representative action "to enjoin, correct, obtain damages for or to otherwise remedy a breach of a trust under which any or all of the assets of a corporation are held." (§ 9142, subd. (a)(1).)

Second, a "member" can bring a representative action "against the officers or directors of the corporation for violation of their authority." (§ 9141, subd. (a).)

Third, a "member" or "former member" (§ 9142, subd. (a)(1)) can bring a representative suit to remedy the misuse of property when property has been contributed to the corporation by a person directly affiliated with the corporation for a specific purpose and the corporation uses that property for a reason other than that specific purpose. (§ 9143, subd. (a).)

Fourth, a "member" can bring a representative lawsuit to remedy "self-dealing transaction[s] . . . to which the corporation is a party and in

[3] All further statutory references are to the Corporations Code unless otherwise stated.

11

which one or more of its directors has a material financial interest." (§ 9243, subds. (a) & (c)(1).)

Last, an "authorized number of members" (§ 9610, subd. (b)),  a creditor, or a director may bring a lawsuit on behalf of the corporation against any one of its directors who approve unlawful distributions. (§ 9245, subds. (a)(1)–(3) & (b)(1)–(2).)

Respondents argue Appellants cannot raise representative claims for fraud, negligent misrepresentation, breach of oral contract, and breach of fiduciary duty because the NRC does not allow a party to allege these causes of action in representative suits. We do not agree.

The NRC does not limit which causes of action a plaintiff may choose from when bringing a representative lawsuit. Instead, the NRC identifies types of wrongs committed against the religious corporation which a party may use a representative lawsuit to remedy: (1) violation of an officer or director's authority; (2) breach of a trust; (3) misuse of certain property; (4) self-dealing transactions; and (5) unlawful distributions. Appellants claim they have standing to raise representative claims because: (1) Alan Scott violated his authority as a director (§ 9141, subd. (a)); and (2) Alan Scott's actions breached a trust under which Dwelling Place's assets were held (§ 9142, subd. (a)(1)).

We need not decide whether the causes of action alleged are permissible vehicles to address these injuries. We assume they are. However, Appellants are not the persons who can assert them.

The NRC limits who may bring a representative lawsuit to, as relevant here, a "member" alleging a director violated their authority (§ 9141, subd. (a)) and a "member" or "former member" alleging breach of a trust. (§ 9142, subd. (a)(1).)

12

First, Appellants contend they are members. But, although they may be a part of the church's congregation, they are not corporate members within the statutory boundaries of the NRC.

The NRC allows a nonprofit religious corporation to define for itself in its articles or bylaws who are statutory members with representative rights. (§ 9332, subds. (a), (b).) Per section 5056, subdivision (a), a "'[m]ember'" is a person who "pursuant to a specific provision of a corporation's articles or bylaws has the right to vote for the election of a director or directors or on a disposition of all or substantially all of the assets of a corporation or on a merger or on a dissolution . . . [or] has the right to vote on changes to the [corporation's] articles or bylaws."

Because churches are these unique species of corporation, the NRC recognizes the church may refer to persons who are part of its congregation as "'members.'" (§ 9332, subd. (a).) But the NRC does not allow these individuals to assert representative lawsuits. Only those persons explicitly authorized to do so by the corporation's articles or bylaws have the power to bring a representative lawsuit. (*Ibid.*) Otherwise, any one of a church's potentially hundreds or thousands of congregants could at any time bring a representative lawsuit.

Dwelling Place's bylaws recognize the distinction between statutory corporate members with representative rights and congregation members who do not have representative rights. Its bylaws separate its members into two classes: "voting members" and "associate members."[4]

---

[4] The trial court took judicial notice of Dwelling Place's bylaws and its articles of incorporation so we may consider them. (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 ["[w]e must take judicial notice of matters properly noticed by the trial court"].)

Voting members are "[t]he Board of Directors and Officers of the Corporation as set forth in the Bylaws . . . ." Associate members are "[a]ll [the] other people who make up the congregation of the church, Vineyard Christian Fellowship of Anaheim [Dwelling Place]." Associate members, i.e., members of the congregation, do not have the right to elect directors. They do not have access to membership rolls and corporate records. Although they can attend corporate meetings, they do not have the right to receive notice as to when the board will hold corporate meetings.

Appellants' allegations demonstrate they are members of the congregation, not the corporation. In their complaint, Appellants alleged Steve Bray, Nancy Bray, Stephanie Ruppe, and David Edmondson are associate members. Thus, they do not have standing to bring any representative suit. Appellants alleged Carol Wimber was an "active and tithing member of the Anaheim Vineyard." This allegation does not establish she is a statutory voting member within the meaning of the NRC. Instead, it shows she is a member of the congregation who actively tithes.

Steve Bray, Nancy Bray, Stephanie Rupp, David Edmondson, and Carol Wimber counter they are statutory members because, under the bylaws, associate members, not just voting members, may vote to remove the senior pastor, who is a director. However, an individual who is a part of a congregation and has a right to be a part of the process of removing the senior pastor is not the equivalent of a statutory corporate member who has the right to vote to elect individuals to the board of directors. The NRC requires the latter.

Appellants alleged Lance Pittluck, Don Salladin, Joe Gillentine, and James Gillentine (collectively, Director Appellants) were directors who voted to hire the Scotts. But the Director Appellants were not directors at the

14

time of the disassociation, the alleged violation of the director's authority. Therefore, at the time of disassociation and when the lawsuit was filed in 2022, they were former members. Only current members can bring a representative lawsuit claiming a director violated their authority. (§ 9141, subd. (a).) Therefore, the Director Appellants do not have standing to bring a representative claim alleging the Scotts violated their authority as directors.

The Director Appellants contend they have standing to "remedy a breach of a trust under which any or all of the assets of a corporation are held." (§ 9142, subd. (a)(1).) They base this on their claim that the disassociation violated the terms of the trust under which Dwelling Place's assets were held. But, to have standing to allege a breach of a trust, they must have been members at the time of the breach of the trust. (§ 5710, subd. (b)(1).) Here, they were not members at the time of the disassociation and so they are not former members for purposes of bringing a representative suit.

In their reply brief, Appellants raise an argument that the Scotts' fraudulent representations were actually the breach of the trust. We are not convinced with this effort to reframe the issue. The Scotts were not directors at the time of the alleged fraudulent representations; they were interviewing for the position. Even if we were convinced, they still do not have standing as they have not alleged the existence of a trust within the meaning of the NRC.

The NRC explains that "[n]o assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies: [¶] (1) Unless, and only to the extent that, the assets were received by the corporation with an express commitment by resolution of its board of directors to so hold those assets in trust. [¶] (2) Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior

15

religious body or general church of which the corporation is a member, so expressly provide. [¶] (3) Unless, and only to the extent that, the donor expressly imposed a trust, in writing, at the time of the gift or donation." (§ 9142, subd. (c)(1)–(3).)

Here, Appellants alleged they "donated substantial monetary funds to [Dwelling Place], in addition to their tithes, . . . with the belief that the funds were being used to support, and further the mission of the Vineyard Movement and Vineyard USA." Those allegations do not establish the existence of a trust within the contours of section 9142. In their reply brief, Appellants admit as much, but claim they are "prepared to plead they had written communication and allege on information and belief that others had written communication with [Dwelling Place's] leadership outlining the purpose of their donations." These proposed amendments are still insufficient to establish the existence of a trust within the meaning of section 9142. Rather, Appellants must be prepared to allege: (1) at the time of their gifts or donations; (2) they "expressly imposed a trust"; and (3) this expression of trust was "in writing." (§ 9142, subd. (c)(1)–(3).) Their proposed amendments do not satisfy these requirements.

Alternatively, Appellants argue section 9142 is not the exclusive means for establishing a trust over the assets of a religious corporation, but just creates a rebuttable presumption that the assets of a religious corporation are not held in trust unless one of the three exceptions apply. This argument goes against the basic tenets of statutory interpretation which we are bound to follow.

"Our goal in interpreting statutes is "'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.'"" (*Smart Corner Owners Assn. v. CJUF*

16

*Smart Corner LLC* (2021) 64 Cal.App.5th 439, 459.) "The "'key to statutory interpretation is applying the rules of statutory construction in their proper sequence . . . as follows: 'we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction."'" (*Id.* at p. 460.) "In the initial step, we examine 'the words of the statute, "because the statutory language is generally the most reliable indicator of legislative intent."' [Citation.] 'When the statutory text is ambiguous, or it otherwise fails to resolve the question of its intended meaning,' we proceed to the second step, and 'look to the statute's legislative history and the historical circumstances behind its enactment.'" (*Ibid.*)

We need go no further than the statutory language to discern the Legislature's intent. There is no rebuttable presumption. The statute means what it says: "No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law" unless one of the exceptions applies. (§ 9142, subd. (c)(1)–(3).) We are confident that if the Legislature intended to create a rebuttable presumption, it would have said so.

In summary, Appellants do not have standing to bring representative claims on behalf of Dwelling Place. We turn now to the individual claims Appellants alleged against the Scotts.

## II.

### APPELLANTS HAVE NOT ALLEGED FACTS
### WHICH STATE A CAUSE OF ACTION AGAINST THE SCOTTS

Appellants' remaining causes of action alleged against the Scotts are for fraud, negligent misrepresentation, declaratory relief, permanent injunction, and constructive trust. We address each in turn.

17

*A.     Fraud*

"""The elements of fraud . . . are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."""" (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 32 (*Rattagan*).) "[F]raud must be alleged with specificity." (*Id.* at p. 43.) "When affirmative misrepresentation fraud is alleged, "" [t]his particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered."""" (*Ibid.*) "California courts apply the same specificity standard to evaluate the factual underpinnings of a fraudulent concealment claim at the pleading stage, even though the focus of inquiry shifts to the unique elements of the claim." (*Ibid.*)

Appellants base their fraud claim on allegations of misrepresentation, concealment, and constructive fraud.

1.     Misrepresentation

Misrepresentation is "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true." (Civ. Code, § 1710, subd. 1.) Here, the affirmative misrepresentations alleged were the Scotts' commitments to the Vineyard Movement and Vineyard USA and Alan Scott's statements that he was "'Vineyard through and through,'" that he "'would never take this house out of the Vineyard Movement,'" and that he "'would consider [the appointment as senior pastor] to be [for] the rest of [his] life.'"

These statements are promises of an intention to perform, which the law can regard as misrepresentations. "A statement of what the defendant or some third person intends to do relates to an existing state of mind, and is a representation of fact. [Citation.] Thus, a promise made

18

without any intention to perform it may constitute fraud. In other words, a promise to do something necessarily implies the intention to perform, and where such intention is absent, there is a misrepresentation of fact, which is actionable fraud." (*Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 203.)

Although the statements may constitute misrepresentations, the Scotts made the statements to the "Search Committee and the Board," of which only Director Appellants were a part. As such, Carol Wimber, Steve Bray, Nancy Bray, Stephanie Rupp, and David Edmonson have not alleged a cause of action for fraud based on misrepresentation.

### 2. Concealment

Concealment consists of "'[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . .'" (*Rattagan, supra*, 17 Cal.5th at p. 39.) "To state a cause of action for fraudulent concealment, the defendant must have been under a duty to disclose some fact to the plaintiff." (*Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 745.) "'Our Supreme Court has described the necessary relationship giving rise to a duty to disclose as a "transaction" between the plaintiff and the defendant. . . . Such a transaction must necessarily arise from direct dealings between the plaintiff and the defendant.'" (*Gilead Tenofovir Cases* (2024) 98 Cal.App.5th 911, 948.)

Appellants assert "[t]he transaction at issue was the hiring of Alan Scott based on his misrepresentations." But the Scotts were not under a duty to disclose their intentions to Appellants as individuals during the interviews. That transaction was between the Scotts and Dwelling Place—the corporation. During the interview process, the Director Appellants were acting in their capacity as agents for Dwelling Place and were seeking to

19

enter an agreement with the Scotts on that basis. (See § 317, subd. (a) [directors are agents of corporation]; *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [unless so stated, directors are not bound as individuals to agreements entered into on behalf of the corporation].) Appellants cannot claim a breach of a duty not owed to them.

### 3. Constructive Fraud

"Constructive fraud """"is a unique species of fraud applicable only to a fiduciary or confidential relationship.""""" [Citation.] 'Constructive fraud "arises on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter to his prejudice."""' (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1131.) "It is essential to the operation of the doctrine of constructive fraud that there exist a fiduciary or special relationship." (*Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 116.)

Appellants contend there was a special relationship between the Scotts and themselves because "the Search Committee placed significant trust in confidence in Alan Scott's interview representations." But again, this relationship was between the Scotts and Dwelling Place, the corporation, not Appellants, the individuals.

In any case, the fraud claims all fail for want of justifiable reliance and damages.

### 4. Justifiable Reliance

"[A]lthough the issue of justifiable reliance ordinarily presents a question of fact [citation], there are cases in which it may be decided as a matter of law." (*Hadland v. NN Investors Life Ins. Co.* (1994) 24 Cal.App.4th 1578, 1586.) Justifiable reliance is an element of affirmative

misrepresentation, concealment, and constructive fraud. (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1185.)

In *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, the plaintiff alleged the defendant "induced him to leave his long-standing, secure employment with an advertising agency in Denver and relocate to Los Angeles by promising him that his employment with [the defendant] would continue indefinitely so long as he performed in a proper and competent manner, that he would not be demoted or discharged except for good cause, and that he would be given notice and a meaningful opportunity to respond to any unfavorable evaluations of his performance." (*Id.* at p. 393.) The plaintiff alleged the promises were false in that the defendant "had no intention of performing them at the time they were made and that he justifiably relied on [the defendant's] promises and suffered damages when [the defendant] failed to perform them." (*Ibid.*) The California Supreme Court held the plaintiff did not establish justifiable reliance. The plaintiff signed an employment contract explaining his employment was at will and the contract "did not contain promises of long-term employment or that termination would be only for cause." (*Ibid.*) Thus, his signing of the contract "stating his employment was at will and terminable at any time as a matter of law defeat[ed] any contention that he reasonably understood [the defendant] to have promised him long-term employment." (*Id.* at p. 394.)

Similarly, here, the bylaws contain no promises of long-term association or devotion to the Vineyard Movement or Vineyard USA. Nor do they allow for such commitments. Instead, they give the senior pastor the "ultimate responsibility" to make all ecclesiastical decisions, including if and when to disassociate, as the senior pastor sees fit. Bylaws, like contracts, "'regulate the conduct and prescribe the rights and duties of [the

21

corporation's] members towards itself and among themselves in reference to the management of [the corporation's] affairs.'" (*Olincy v. Merle Norman Cosmetics, Inc.* (1962) 200 Cal.App.2d 260, 267.) It is unreasonable for Appellants to believe the Scotts were beholden to commitments which the bylaws did not permit. (*Central Coast Baptist Assn. v. First Baptist Church of Las Lomas* (2007) 171 Cal.App.4th 822, 851 (*Central Coast Baptist*) ["The effect of decisions made and actions taken in violation of the constitution, bylaws and rules of governance of a church entity is that such actions are void and of no effect"].)

> 5.    Damages

"To recover for fraud, a plaintiff must prove loss proximately caused by the defendant's tortious conduct." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 65.) "'Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown.'" (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818 (*Service by Medallion*).)

Appellants argue they were harmed because they donated funds to Dwelling Place "for a specific purpose—to support the flagship church of the Vineyard movement. Their donations did not go to that purpose. They went towards funding Alan Scott's efforts plan [*sic*] to remove the Church from Vineyard USA. In addition, Appellants have lost the benefit of their home church."

But this harm did not flow from the alleged misrepresentations and concealment. Although the alleged fraudulent acts and concealment led to the Scotts' hiring as senior pastors, the harm complained of was not realized until Dwelling Place disassociated. "It was only when [the Scotts

22

disassociated] that [Appellants] could have perceived its [tithing and donations] as 'losses.'" (*Service by Medallion, supra*, 44 Cal.App.4th at p. 1819.) Appellants concede the Scotts had the right to disassociate and do not challenge the propriety of that decision.

Moreover, as alleged, Dwelling Place's then board ratified the Scotts' decision to disassociate. Thus, the actions of the board were a cause, unrelated to the fraudulent acts, of the disassociation. Liability cannot "attach[] if the damages sustained were otherwise inevitable or due to *unrelated causes.*" (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 365.)

## B. Negligent Misrepresentation

The elements of negligent misrepresentation include "'justifiable reliance on the misrepresentation, and . . . resulting damage.'" (*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50.) As we explained, the allegations demonstrate neither justifiable reliance nor resulting damage.

## C. Declaratory Relief

Appellants seek an order declaring they can inspect Dwelling Place's corporate documents, the fraudulent nature of the Scotts' hiring, and that the assets of Dwelling Place must be used to further the purpose of Vineyard USA and the Vineyard Movement.

"'One cannot analyze requested declaratory relief without evaluating the nature of the rights and duties that the plaintiff is asserting, which must follow some recognized or cognizable legal theories that are related to subjects and requests for relief that are properly before the court.'" (*D. Cummins Corp. v. United States Fidelity & Guaranty Co.* (2016) 246 Cal.App.4th 1484, 1489.)

Here, under the NRC, "members" have the right to inspect the accounting books, records, and minutes of the corporation (§ 9512) and "the record of all the members' names, addresses and voting rights . . . ." (§ 9511). As we explained, Appellants are not members. And we are aware of no other statutory or legal basis to grant the relief requested, nor do Appellants provide us with any.

Since Appellants' remaining causes of action otherwise fail for the reasons discussed, they present no cognizable legal theory which would support their requested declaratory relief.

D.     *Permanent Injunction and Constructive Trusts*

Permanent injunctions and constructive trusts are not causes of action. (*Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 76 [constructive trust not a cause of action]; *Applied Medical Distribution Corp v. Jarrells* (2024) 100 Cal.App.5th 556, 573 [permanent injunction not a cause of action].) "[A] demurrer tests the sufficiency of the factual allegations of the complaint rather than the relief suggested in the prayer of the complaint." (*Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1562.) Without facts giving rise to the right to these reliefs, a complaint is not saved because they are labeled as causes of action. (*Applied Medical,* at p. 573 [remedies cannot ""'be issued if the underlying cause of action is not established"'"].)

III.

THE FIRST AMENDMENT BARS THE COMPLAINT

Even assuming the complaint stated sufficient facts to allege causes of action, the First Amendment would bar this case from going forward.

24

"The Religion Clauses of the First Amendment provide: 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." (*Cutter v. Wilkinson* (2005) 544 U.S. 709, 719.) "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all 'government regulation of religious *beliefs* as such.' [Citation.] The government may not compel affirmation of religious belief, [citation], punish the expression of religious doctrines it believes to be false, [citation], impose special disabilities on the basis of religious views or religious status, [citations], or lend its power to one or the other side in controversies over religious authority or dogma, [citations]." (*Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872, 866, superseded by statute as stated in *Ramirez v. Collier* (2022) 595 U.S. 411.) Appellants' complaint violates almost all these tenets.

Appellants ask the court to impose a trust over Dwelling Place's assets in favor of Vineyard USA and to require the Scotts to keep Dwelling Place a part of the Vineyard Movement and Vineyard USA. Even if the facts alleged in the complaint entitled Appellants to such relief, they are essentially asking the court to manage and run Dwelling Place in a manner consistent with their religious beliefs. We would have to administer Dwelling Place's assets to further a religious doctrine to which Appellants ascribe. Worse, we would then potentially violate the Scotts' religious beliefs by

forcing them to minister Dwelling Place in a mode Appellants see appropriate. We will not do any of this.

To get around these problems, Appellants ask us to view this case as simply a property dispute. It is true "'[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively.'" (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 478 (*Episcopal Church Cases*).) But not when the dispute is so intertwined with religious doctrine that we cannot separate the property from the religion. *Episcopal Church Cases* and *Central Coast Baptist, supra*, 171 Cal.App.4th 822 both illustrate this principle.

In *Episcopal Church Cases, supra*, 45 Cal.4th 467, a local parish withdrew from the national Episcopal Church over its ordination of an openly gay man. (*Id.* at p. 475.) A dispute then arose between the local church and the national Episcopal Church over who owned the local church building and the property on which it stood. (*Id.* at p. 476.) The California Supreme Court determined that under the governing documents of the local and national churches, the church building and property reverted to the national church upon disaffiliation. (*Id.* at p. 489.) The high court noted it could decide the issue as there were no questions of religious doctrine involved—only application of neutral property law. (*Id.* at p. 485.)

Compare *Central Coast Baptist, supra*, 171 Cal.App.4th 822, where the plaintiff, a voluntary association of Southern Baptist churches, alleged that an attempted takeover of a local church by a nondenominational church triggered a reversionary clause in the local church's constitution, which provided that its assets would pass to the plaintiff if it should "'cease to be a Southern Baptist Church.'" (*Id.* at p. 827.) The court held the First

26

Amendment barred the resolution of the claim because the determination of whether the local church "'cease[d] to be a Southern Baptist Church,' so as to trigger the reversionary clause in its constitution, to some extent required the court to involve itself in questions of religious doctrine, polity and practice." (*Id.* at p. 845.) For example, the court would be asked to decide "what doctrines or practices characterize a Southern Baptist church as such, and then to evaluate the actions taken by [the local church] in order to determine whether [its] departure was so significant that [the local church] could no longer be considered 'to be a Southern Baptist Church.'" (*Ibid.*) "[T]he court could not conduct this inquiry without delving into 'matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion.'" (*Ibid.*)

Similarly, here, we could not resolve Appellants' claims without deciding what it means to be "Vineyard through and through," and what it means to be a part of the Vineyard Movement. For all we know, disassociating at the time and in the manner the Scotts did *is* what it means to be "Vineyard through and through" and actually furthered the Vineyard Movement. We could not decide that without determining "what doctrines or practices characterize a [Vineyard] church as such, and then . . . evaluate the actions taken by [the Scotts] in order to determine whether [their actions could be] considered ["Vineyard through and through"]." (*Central Coast Baptist, supra*, 171 Cal.App.4th at p. 845.) We cannot do that. (See *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 449 ["First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice"].)

27

Notably, Vineyard USA, whom Appellants seek to impose the trust in favor of, is not a named plaintiff and does not claim any ownership interest over Dwelling Place's assets or property. Further, and importantly, Dwelling Place's board of directors ratified the Scotts' decision to disassociate. Therefore, even if we viewed this case as a property dispute, "civil courts applying neutral principles of law must defer to the authoritative decisions of [the church] on any matters of internal church polity necessarily involved in resolving the issue." (*Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1412.) We would have to follow the board of directors' ratification.

We note the ministerial exception also bars Appellants' claims. Under the "'ministerial exception,'" "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." (*Our Lady of Guadalupe School v. Morrissey-Berra* (2020) 591 U.S. 732, 746.) "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." (*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* (2012) 565 U.S. 171, 188.) We cannot litigate Appellants' claims or grant the relief they seek without in some way punishing the church for its hiring of the Scotts, retention of the Scotts, or ratification of the Scotts' decisions and actions. We will not do this. (*Id.* at pp. 194–195 ["The exception . . . ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' [citation]—is the church's alone"].)

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs incurred on appeal.

SANCHEZ, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.